# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 23-1353

ROBERT BEVIS, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CITY OF NAPERVILLE, ILLINOIS and JASON ARRES,

*Defendants-Appellees,*

*and*

THE STATE OF ILLINOIS,

*Intervening Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-04775 — **Virginia M. Kendall**, *Judge.*

No. 23-1793

JAVIER HERRERA,

*Plaintiff-Appellant,*

*v.*

KWAME RAOUL, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:23-cv-00532 — **Lindsay C. Jenkins**, *Judge.*

———————————

No. 23-1825[1]

CALEB BARNETT, *et al.*,

*Plaintiffs-Appellees,*

*v.*

KWAME RAOUL and BRENDAN F. KELLY,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Southern District of Illinois.
No. 3:23-cv-00209-SPM — **Stephen P. McGlynn**, *Judge.*

———————————

ARGUED JUNE 29, 2023 — DECIDED NOVEMBER 3, 2023

———————————

Before EASTERBROOK, WOOD, and BRENNAN, *Circuit Judges.*

WOOD, *Circuit Judge.* The Second Amendment to the Constitution recognizes an individual right to "keep and bear Arms." Of that there can be no doubt, in the wake of the

---

[1] Consolidated with No. 23-1826, *Harrel v. Raoul* (S.D. Ill. No. 3:23-cv-00141-SPM); No. 23-1827, *Langley v. Kelly* (S.D. Ill. No. 3:23-cv-00192-SPM); and No. 23-1828, *Federal Firearms Licensees of Illinois*, et al. *v. Pritzker* (S.D. Ill. No. 3:23-cv-00215-SPM).

Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (*per curiam*); and *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). But as we know from long experience with other fundamental rights, such as the right to free speech, the right peaceably to assemble, the right to vote, and the right to free exercise of religion, even the most important personal freedoms have their limits. Government may punish a deliberately false fire alarm; it may condition free assembly on the issuance of a permit; it may require voters to present a valid identification card; and it may punish child abuse even if it is done in the name of religion. The right enshrined in the Second Amendment is no different.

The present cases, which we have consolidated for disposition, relate to the types of "Arms" that are covered by the Second Amendment.[2] This presents a line-drawing problem. Everyone can agree that a personal handgun, used for self-defense, is one of those Arms that law-abiding citizens must be free to "keep and bear." Everyone can also agree, we hope, that a nuclear weapon such as the now-retired M388 Davy Crockett system, with its 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry.[3] Many weapons, however, lie between these

---

[2] For ease of exposition, we will use the term Arms to refer to those weapons that fall within the scope of the Second Amendment.

[3] See Matthew Seelinger, *The M28/M29 Davy Crockett Nuclear Weapon System*, THE ARMY HISTORICAL FOUNDATION, https://armyhistory.org/the-m28m29-davy-crockett-nuclear-weapon-system/; see also Jeff Schogol, *The Story of the 'Davy Crockett,' a Nuclear Recoilless Rifle Once Fielded by the*

extremes. The State of Illinois, in the legislation that lies at the heart of these cases, has decided to regulate assault weapons and high-capacity magazines—a decision that is valid only if the regulated weapons lie on the military side of that line and thus are not within the class of Arms protected by the Second Amendment. Several municipalities have done the same. The plaintiffs in these cases challenge that conclusion. Using the tools of history and tradition to which the Supreme Court directed us in *Heller* and *Bruen*, we conclude that the state and the affected subdivisions have a strong likelihood of success in the pending litigation. We therefore affirm the decisions of the district courts in appeals No. 23-1353 and 23-1793 refusing to enjoin these laws, and we vacate the injunction issued by the district court in appeals No. 23-1825, 23-1826, 23-1827, and 23-1828.

## I.    Background

### A.  The Act

At the center of these appeals lies a new statute in Illinois that took effect on January 10, 2023—a measure called the Protect Illinois Communities Act, Pub. Act 102-1116 (2023) ("the Act"). Some of the consolidated cases also implicate three municipal laws that cover much of the same ground, though the details vary: Cook County Ordinances No. 54-210 to 54-215; City of Chicago Municipal Ordinances 8-20-010 to 8-20-100; and City of Naperville Ordinances No. 3-19-1 to 3-19-3. We make note of the municipal laws only when their specific provisions affect our analysis. For the interested reader, the chart

---

*US Army*, Task & Purpose (Sept. 19, 2022), https://taskandpurpose.com/history/army-davy-crockett-tactical-nuclear-weapon/.

in the Appendix to this opinion summarizes the relevant differences among these enactments.

The Act is a sprawling piece of legislation made up of 99 sections that cover a vast array of regulatory and record-keeping matters, along with the provisions of interest here. The Act's wide scope led to a challenge in Illinois's courts for failing to comply with state-law requirements such as the single-subject rule, the three-readings requirement, and the ban on special legislation. See *Caulkins v. Pritzker*, 2023 IL 129453 (Aug. 11, 2023). The state supreme court upheld the Act against those contentions, and it also ruled that the Act did not violate the state constitution's equal protection clause. It did not reach any argument about the Second Amendment, because it found that the plaintiffs had waived any reliance on that theory. The plaintiffs in these cases have not argued that the Act is invalid under state law.

The critical part of the Act for our purposes is its treatment of so-called assault weapons and large-capacity magazines. Those sections institute something close to a ban on "assault weapons," through the Act's general prohibitions of the sale, possession, and use of a defined set of weapons. The Act also bans large-capacity magazines. The plaintiffs have not specified exactly which provisions of the Act they believe are unconstitutional under the Second Amendment, but we assume that their principal targets are 720 ILCS 5/24-1.9 and 5/24-1.10. Section 5/24-1.9 addresses the "[m]anufacture, possession, delivery, sale, and purchase of assault weapons, .50 caliber rifles, and .50 caliber cartridges," and section 5/24-1.10 deals with "[m]anufacture, delivery, sale, and possession of large capacity ammunition feeding devices."

The Act defines "assault weapon" using language that is largely borrowed from the expired Federal Assault Weapons Ban, which was a subsection of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.[4] The Illinois Act bans certain semiautomatic rifles and pistols. A semiautomatic rifle falls under the Act's proscriptions if it has the capacity to accept a detachable magazine and one or more of the following features: a pistol grip or thumbhole stock; any feature capable of functioning as a protruding grip for the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock or a stock that otherwise enhances the concealability of the weapon; a flash suppressor; a grenade launcher; or a barrel shroud. 720 ILCS 5/24-1.9(a)(1)(A). The definition also includes a semiautomatic rifle with a fixed magazine capacity of greater than 10 rounds, except those that accept only .22 caliber rimfire ammunition. *Id.* 5/24-1.9(a)(1)(B). Finally, there is a lengthy list of particular models that fall within the scope of the statute. See 5/24-1.9(a)(1)(J). Subpart (i) of that section covers all AK weapons, and subpart (ii) covers all AR types. In the remainder of this opinion, we will refer often to the AR-15 as a paradigmatic example of the kind of weapon the statute covers. We use it only illustratively, however; our analysis covers everything mentioned in the Act.

The Act makes it unlawful for any person within Illinois knowingly to "manufacture, deliver, sell, import, or purchase … an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge." *Id.* 5/24-1.9(b). (Unless the context requires otherwise, from this point we use the

---

[4] The more formal name of the relevant part of the law was the Public Safety and Recreational Firearms Use Protection Act.

term "assault weapon" to cover all four covered items, in the interest of readability.) With some exceptions, the Act also makes it unlawful as of January 1, 2024, for any person within the state knowingly to "possess an assault weapon." *Id.* 5/24-1.9(c).

There are two significant exceptions to these prohibitions. Using the terminology the Supreme Court of Illinois adopted in *Caulkins*, the first is for "trained professionals" and the second is for "grandfathered individuals." 2023 IL 129453 at ¶ 1. The list of trained professionals, set forth in 5/24-1.9(e), includes peace officers; qualified active and retired law-enforcement officers; prison wardens and "keepers"; members of the Armed Services, Reserves, or Illinois National Guard; nuclear facility guards; and licensed private security personnel. *Id.* 5/24-1.9(e)(1)–(7). The "grandfather" provision can be found at 5/24-1.9(d). It states that the Act's prohibitions do "not apply to a person's possession of an assault weapon … if the person lawfully possessed" that weapon as of the effective date of the law and then the person "provide[s] in an endorsement affidavit, prior to January 1, 2024, under oath or affirmation" certain specified information to the Illinois State Police. *Id.* 5/24-1.9(d)(1)–(3). A completed endorsement affidavit "creates a rebuttable presumption that the person is entitled to possess and transport the assault weapon." *Id.* 5/24-1.9(d), at ¶ 2. The Act restricts the places where authorized persons may possess their weapons to the following: (1) private property owned or controlled by the person; (2) other private property, with the express permission of the owner or controller; (3) premises of a licensed firearms dealer or gunsmith for lawful repairs; (4) licensed firing ranges or sport shooting competition venues; and (5) in transit to or from any of those locations, if the weapon is unloaded and in a container. *Id.*

5/24-1.9(d), at ¶ 3(1)–(5). The parties have not focused on these locational restrictions, and so neither will we.

Section 5/24-1.10 sets out the rules for large-capacity ammunition feeding devices. They are defined as a magazine (or similar mechanism) that can accept "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." *Id.* 5/24-1.10(a), at ¶ 3(1). This provision also grandfathers in those who lawfully possessed a large-capacity magazine before the effective date of the Act, so long as the device is used in a permitted place. *Id.* 5/24-1.10(d). It has an analogous set of exceptions for trained professionals. *Id.* 5/24-10(d), at ¶ 1.

Broadly speaking, violations of the assault-weapon ban are classified as felonies when the violation involves guns or gun parts, and as misdemeanors when the violation involves .50 caliber cartridges. *Id.* 5/24-1(b).

### B.  The Lawsuits

The ink was barely dry on the pages of the Act when litigation began. Before us now are six related cases, in which 26 plaintiffs have challenged the Act and the three municipal ordinances we mentioned earlier. All of the challengers contend that the legislation in question violates their Second Amendment right to keep and bear Arms. A brief review of the individual cases should help keep the issues straight.

### 1.  *Bevis v. City of Naperville* (No. 23-2353)

This case, filed in the Northern District of Illinois, was brought by three parties: (1) Robert Bevis, a Naperville resident and owner of Law Weapons, Inc.; (2) Law Weapons, Inc., a commercial firearms store in Naperville; and (3) the National Association for Gun Rights. We refer to them

collectively as Bevis. Once the suit was filed and landed in Judge Kendall's court, Bevis's first step was to seek a preliminary injunction against both the Naperville ordinance and the Act. They were unsuccessful. Applying the standard four-part test for preliminary injunctions established in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), Judge Kendall decided that the plaintiffs were unlikely to succeed on the merits. This would have been an easy conclusion under our decision in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), but the judge was concerned that *Friedman*'s methodology may have been undermined by *Bruen*, and so she undertook a fresh analysis of the merits using only *Bruen*. (We address *Friedman*'s continuing vitality below.)

Judge Kendall's efforts convinced her that "[t]he history of firearm regulation … establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)." *Bevis v. City of Naperville*, No. 22 C 4775, 2023 WL 2077392, at *14 (N.D. Ill. Feb. 17, 2023). She took particular note of longstanding regulations on Bowie knives and other "melee weapons." *Id.* at *10–11. Next, she found that assault weapons fit within this tradition because they pose "an exceptional danger" compared with "standard self-defense weapons such as handguns." *Id.* at *14. Critically for our purposes, after citing statistics about the lethality and injury rates of assault weapons, *id.*, she highlighted the fact that "[a]ssault rifles can … be easily converted to … mimic military-grade machine guns," *id.* at *15. Quoting from the Fourth Circuit, she observed that

> the very features that qualify a firearm as a banned assault weapon—such as flash

> suppressors, barrel shrouds, folding and tele-
> scoping stocks, pistol grips, grenade launchers,
> night sights, and the ability to accept bayonets
> and large-capacity magazines—serve specific,
> combat-functional ends.

*Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (*en banc*), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2126–27) (cleaned up). Finally, the judge noted that the high-capacity magazines exhibited similar dangers. *Id.*

This was enough, in her view, to show that the plaintiffs were not likely to succeed on the merits. Quickly looking at the other three criteria for a preliminary injunction, she also found that without a presumption of irreparable harm related to the alleged Second Amendment violation, plaintiffs could not satisfy that factor. Bevis had not shown that the gun shop would lose substantial sales because of the two laws, and the organizational members retained other effective weapons for self-defense. *Id.* at *16. Finally, Judge Kendall concluded that neither the balance of equities nor the public interest favored plaintiffs sufficiently to overcome the inadequate showing on the other issues. *Id.* at *17.

### 2. *Herrera v. Raoul* (No. 23-1793)

The plaintiff in our next case, Javier Herrera, is a Chicago emergency room doctor who owns several assault weapons and large-capacity magazines. After the Act was passed, he filed a suit seeking both a temporary restraining order and a preliminary injunction against the Act, the Chicago ordinance, and the Cook County ordinance. Unlike Bevis, he also challenged the Act's registration requirements (through which the grandfathering provisions are administered). This

case was assigned to Judge Jenkins, who largely agreed with the reasoning in *Bevis*. See *Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023). She rejected Hererra's attempt to distinguish *Bevis* on the ground that his suit focused on the defense of his home, rather than on the public-carry right. Although she recognized that the analogies to Bowie knives and melee weapons were not perfect, she noted that *Bruen* did not demand a "dead ringer" or a "historical twin," especially if there are "'dramatic technological changes' or 'unprecedented societal concerns' [that] may require a 'more nuanced approach.'" *Id.* at *7, *9 (quoting *Bruen*, 142 S. Ct. at 2133, 2132).

With respect to the need to register a covered weapon in order to take advantage of the Act's grandfathering provision, Judge Jenkins first assured herself that the question was ripe even though Herrera had not yet taken steps to register his guns. *Id.* at *8. Herrera made clear that he intended to disobey that law, that his intended conduct "[ran] afoul of a criminal statute," and that the effective date of the registration requirement was "sufficiently imminent." *Id.* (quotations omitted). On the merits, however, she concluded that Herrera was unlikely to succeed because historical evidence showed that the "colonies required gun registration in a variety of ways," such as colonial "muster" requirements and a variety of tax requirements, "which in essence required that firearms be identified and disclosed to the government." *Id.* at *9. She also took note of several 19th- and 20th-century laws as evidence of a "continuing tradition of state and national registration requirements." *Id.* She found support for her ruling in the *Bruen* Court's comment that "nothing in our analysis should be interpreted to suggest the unconstitutionality of existing 'shall-

issue' licensing laws." *Id.* at *10 (quoting *Bruen*, 142 S. Ct. at 2138 n.9 (cleaned up)).

Although lack of likely success on the merits pointed strongly toward denial of preliminary injunctive relief, Judge Jenkins also looked briefly at the other three factors and found that they pointed in the same direction. She rejected the argument that there is an established presumption of irreparable harm for all Second Amendment challenges. *Id.* at *11. She was also unpersuaded by Herrera's argument that the laws prevented him from protecting himself in his home and attending his monthly SWAT training (because of the commute time to retrieve his assault weapons from an out-of-county location). Herrera owned other compliant guns suitable for self-defense, and he had managed the commute since 2018. *Id.* at *12. Lastly, she found that neither the public interest nor the equities pushed the needle far enough to justify an injunction. *Id.* at *13.

### 3. *Barnett v. Raoul* (No. 23-1825)

The perspective reflected in the third case, which arose in the Southern District of Illinois, is quite different from the first two. In *Barnett* and the three other cases that were consolidated with it, the plaintiffs included individual gun owners, commercial firearms dealers, and various organizations devoted to protecting and enhancing Second Amendment rights. Like their counterparts in the Northern District, these plaintiffs sought a preliminary injunction against the Act. Unlike the others, they succeeded. Judge McGlynn concluded that because the plaintiffs had brought a facial challenge to the Act, "the entirety of [the Act] as codified will be enjoined." *Barnett v. Raoul*, No. 3:23-cv-00209-SPM (Lead Case), 2023 WL 3160285, at *2 (S.D. Ill. Apr. 28, 2023). (We put to one side the

fact that there are many provisions of the Act that have nothing to do with gun ownership or regulation. See generally Pub. Act 102-1116 (2023). Presumably the judge did not mean to enjoin them, but if that is so, then the injunction does not comply with Federal Rule of Civil Procedure 65. That rule requires an injunction to indicate clearly what is forbidden or mandated—a rule necessitated by the fact that injunctions are enforceable by contempt. We need not explore this further, given our ultimate conclusion in these appeals.)

With obvious reference to the two sections of the Act that address assault weapons and high-capacity magazines, Judge McGlynn chose to start with the issue of irreparable injury, rather than likelihood of success on the merits. He found that there is a presumption of irreparable harm when plaintiffs mount a facial challenge under the Second Amendment, and even if there were not, these plaintiffs had shown irreparable injury because the restrictions on their ability to buy or sell the weapons and accessories covered by the Act limited their right to armed self-defense. 2023 WL 3160285, at *4–5.

The judge then moved on to likelihood of success on the merits. He rejected the defendants' arguments that many of the Act's provisions regulated only accessories (such as threaded barrels and pistol grips), which in themselves were not the Arms protected by the Second Amendment. Those items were "important corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at *8 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)). He then moved on to consider whether the Act was "consistent with this Nation's historical tradition of firearm regulation." *Id.* at *9. For this purpose, he assigned to the defendants the burden of "(1) demonstrat[ing] that the 'arms' in

[the Act] are not in 'common use;' and (2) 'identify[ing] a well-established and representative historical analogue' to [the Act]." *Id.* (quoting *Bruen*, 142 S. Ct. at 2128, 2133). He rejected the defendants' argument that the weapons had to be in common use for self-defense. The defendants failed to carry their burden, he held, because they "focused almost entirely on AR-15 rifles and their commonality or lack thereof" instead of the many other weapons and accessories covered by the Act. *Id.* at *10. Accepting an argument of the plaintiffs in the cases now before us (as well as their *amici curiae*), the judge held that AR-15s and large-capacity magazines are "in common use" because a large number of people own them. *Id.*

Wrapping up, the judge characterized the defendants' proposed historical analogues as inapt, because they were simply concealed-carry regulations, not outright bans on possession. *Id.* at *11. The balance of harms, in his view, decidedly favored the plaintiffs, as (in his words) "there can be no harm to a government agency when it is prevented from enforcing an unconstitutional statute," *id.* (cleaned up and quotation omitted), and he saw no evidence in the record indicating how the Act would help Illinois communities. He noted that the Act "was purportedly enacted in response to the Highland Park [mass] shooting," *id.* at *12, but that fact was not enough to overcome the injury it inflicted.

## II.    Governing Law

### A.  Preliminary Injunction Standard

As our account of the proceedings in the district courts shows, we are not here today to rule definitively on the constitutionality of the Act or any of the municipal ordinances. The only issue before us concerns preliminary injunctive

relief. The *Bevis* and *Herrera* courts denied motions for such an injunction, which would have suspended the operation of 720 ILCS 5/24-1.9 and 5/24-1.10 (and the corresponding Naperville, Chicago, and Cook County ordinances), and the *Barnett* court granted the injunction (ostensibly against the entire Act, as we mentioned). We entered a stay of the *Barnett* injunction pending the resolution of these interlocutory appeals, which are authorized by 28 U.S.C. § 1292(a)(1); the order stipulated that the stay would remain in effect "until these appeals have been resolved and the court's mandate has issued."

As we mentioned earlier, the leading Supreme Court decision establishing the standard for granting preliminary injunctive relief is *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). The Court summarized the pertinent requirements as follows:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20. It elaborated on these factors in a later case dealing with the criteria for staying a court decision, *Nken v. Holder*, 556 U.S. 418 (2009), noting there that "[t]here is substantial overlap between [the criteria for a stay] and the factors governing preliminary injunctions." *Id.* at 434 (citing *Winter*, 555 U.S. at 24). The two most important considerations are likelihood of success on the merits and irreparable harm. *Id.* With respect to the former, the Court said that "[i]t is not enough that the chance of success on the merits be 'better than

negligible.'" *Id.* (quoting and disapproving *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)). Nor is a mere possibility enough. *Id.* As we put it in *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), although the party seeking the injunction need not demonstrate likelihood of success by a preponderance of the evidence, that party must nevertheless make a "strong" showing that reveals how it proposes to prove its case. Similarly, a mere possibility of irreparable harm will not suffice. See *Nken*, 556 U.S. at 434–35; *Winter*, 555 U.S. at 22.

Decisions such as *Winter* and *Nken* reflect the fact that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. The party seeking the injunction bears the burden of showing that this type of relief is warranted. *Nken*, 556 U.S. at 433–34. We must also bear in mind, when a party is seeking to enjoin a statute, that legislative enactments are entitled to a presumption of constitutionality. See *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128 (1810)). Though we carefully evaluate any claim that a statute violates the Constitution, we assume that the legislative body—whether Congress or a state legislature—was aware of constitutional limitations and endeavored to follow them.

Finally, we note that a hybrid standard of review applies to interlocutory review of a preliminary injunction: "we review the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion." *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (brackets and quotation omitted).

## B. The Second Amendment

The basic contours of the second article of the Bill of Rights have become familiar, and so we will only summarize them here. In a crisp, if not enigmatic, way, it says this: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. For many years, both the Supreme Court and scholars thought that there was a relation between the prefatory clause, which refers to the Militia, and the operative clause, which refers to the right to keep and bear Arms. See, *e.g.*, ROBERT H. BORK, SLOUCHING TOWARDS GOMORRAH: MODERN LIBERALISM AND AMERICAN DECLINE 166 (rev. ed. 2003). But in *Heller* the Supreme Court severed that connection. Undertaking its own examination of the events that led up to the Amendment's inclusion in the Constitution, it concluded that the Amendment recognized an individual right to keep and bear Arms.

At the same time, *Heller* held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. It continued as follows:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.

*Id.* This opened up new frontiers of litigation: Which weapons are covered? What manner of "keeping and bearing" is protected? What purpose must or may the user have? Which people hold this right? The *Heller* Court recognized that there was much left to be resolved. It did give some hints, however. One

important tea leaf for present purposes was its refusal to en-
dorse the idea that the Amendment protects "only those
weapons useful in warfare." *Id.* at 624. It called this a "star-
tling reading," since that would have implied that ma-
chineguns—quintessential weapons used exclusively by the
military, not private citizens—could not be regulated, in the
face of the National Firearms Act's restrictions on those weap-
ons. *Id.*; see also Pub. L. No. 73-474, 48 Stat. 1236 (1934).

Perhaps the most important expansion of *Heller* occurred
in *McDonald*, in which the Supreme Court confirmed that the
Second Amendment, like the First, Fourth, Fifth, Sixth, and
Eighth Amendments, applies to the states through incorpora-
tion pursuant to the Fourteenth Amendment. See 561 U.S. at
750. The late date of the *McDonald* decision—2010—explains
why there are so few cases exploring the Second Amendment
implications of state laws regulating weapons from the time
the Amendment became part of the Constitution (1791) to the
present. Under the view that prevailed until *McDonald*, the
states were free to regulate weapons in any way compatible
with their own constitutions. See generally Jeffrey S. Sutton,
*51 Imperfect Solutions: States and the Making of American Consti-
tutional Law* (2018). And they did so in countless ways—a
point of some significance when we come to consider the his-
tory and tradition of regulation in this area.

After *McDonald*, most courts of appeals adopted a two-
step test for legality under the Second Amendment. See, *e.g.*,
*Ezell*, 651 F.3d at 702–03. Step one asked whether the "chal-
lenged firearms law regulates activity falling outside the
scope of the Second Amendment right as it was understood
[historically]." *Id.* If the regulated activity was unprotected,
then the law in question was not subject to further Second

Amendment review. If, however, history showed that the activity was protected, or the evidence was inconclusive, step two called on the court to balance the public benefit the government was seeking to achieve against the regulatory means it selected, using a form of heightened scrutiny. *Id.* at 703.

Some courts, including our own, steered clear of that two-step approach. That explains the path we chose in *Friedman*, which dealt with exactly the same issue we face now: a ban on assault weapons and large-capacity magazines. Although the district court in *Bevis* thought that the reasoning in *Friedman* might not have survived *Bruen*, we see *Friedman* as basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on history, not on a free-form balancing test.

After briefly reviewing the holdings in *Heller* and *McDonald*, *Friedman* turned to the question of the scope of the individual right to keep and bear Arms. It began by summarizing the Court's own historical analysis in *Heller*:

> [The Court] cautioned against interpreting the [*Heller*] decision to cast doubt on "longstanding prohibitions," including the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" [554 U.S.] at 623, 627. It observed that state militias, when called to service, often had asked members to come armed with the sort of weapons that were "in common use at the time", *id.* at 624, and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory),

> such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not. *Id.* at 624–25.

784 F.3d at 407–08. The plaintiffs in *Friedman* had contended that "there is no 'historical tradition' of banning possession of semi-automatic guns and large-capacity magazines." *Id.* at 408. But, we observed, "this argument proves too much: its logic extends to bans on machine guns, … [but] *Heller* deemed a ban on private possession of machine guns to be obviously valid." *Id.* (citing *Heller*, 554 U.S. at 624). That was so even though states "didn't begin to regulate private use of machine guns until 1927," and the federal government did not do so until 1934. *Id.*

The critical question of "[h]ow weapons are sorted between private and military uses," we noted, "has changed over time." *Id.* Anticipating *Bruen*, we rejected a historical focus on the 1920s, when these bans started to come into existence, and turned instead to the time of the Second Amendment's adoption. *Id.* With respect to the common ownership and use question, we cautioned against circular reasoning:

> Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

*Id.* at 409.[5] We were not persuaded by the plaintiffs' efforts to put semiautomatic weapons on the "private" or "mixed" side of the line between private or mixed private/military weapons, on the one hand, and weapons exclusively for military use, on the other. We were reluctant to place semiautomatic weapons in the former category for the simple reason that the *Heller* Court had not done so. Instead, in distinguishing *United States v. Miller*, 307 U.S. 174 (1939), we reaffirmed "the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service." 784 F.3d at 408.

Conspicuously absent from our *Friedman* analysis is any hint of the two-part test that *Bruen* disapproved. We looked instead to the type of Arms that the Second Amendment has always protected for private use and contrasted them with weapons reserved for military use. We expressly declined to subject Highland Park's law to means-end scrutiny. *Id.* at 410. Instead, we said, "we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' … and whether law-abiding citizens retain adequate means of self-defense." *Id.* (quoting *Heller*, 554 U.S. at 622 (quoting *Miller*, 307 U.S. at 178)). This approach, we believe, is consistent with the methodology approved in *Bruen*.

---

[5] The dissent embraces the reasoning we rejected in *Friedman*; it asserts that circularity concerns are more hypothetical than actual. See *post* at 62 n.4 (citing *Friedman*, 784 F.3d at 416 n.5 (Manion, J., dissenting)).

Pointing to *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) (*per curiam*), the dissent sees *Friedman* differently. It notes that one can find language in *Wilson* that characterizes *Friedman* as "evaluat[ing] the importance of the reasons for the [assault weapons ban] to determine whether they justified the ban's intrusion on Second Amendment rights." 937 F.3d at 1036. But this language is pure *dicta.* It may represent the *Wilson* panel's attempt to put a gloss on *Friedman*, but it did not change the actual legal test that *Friedman* applied. The issue in *Wilson*, recall, was whether *Friedman* could be reconciled with *Ezell*, which struck down Chicago's ban on firing ranges within city limits. See *id.* at 1035. On that issue, *Wilson* found that "*Friedman* fits comfortably under the umbrella of *Ezell*" and that it "represents the application and extension of its principles to the specific context of a ban on assault weapons and large-capacity magazines." *Id.* at 1036. Indeed, *Wilson* is notable for what it did *not* say: it never said that *Friedman* had used intermediate scrutiny or means-end balancing; and it did not depict *Friedman* as evaluating only the importance of the reasons behind the ordinance at issue there. The fleeting reference to the city's reasons for adopting the ordinance, in short, was not part of the panel's reasoning, and so, while certainly disapproved in *Bruen*, does not undermine the central analysis in the case.

We have now referred many times to *Bruen*, and finally, it takes center stage. Rejecting the two-part test adopted by the courts of appeals (which it derided as having "one step too many," 142 S. Ct. at 2127), the *Bruen* Court elaborated on the test that *Heller* requires. See 142 S. Ct. at 2129–30. First, it said, the trial court must decide whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If so, then "the Constitution presumptively protects that conduct."

*Id.* at 2130. The analysis then moves to the second step, which calls on the "government [to] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* The Court predicted that this second step would be relatively easy in some instances, when historical analogues are easy to find. But in other instances, it recognized that the task would be challenging. It singled out "cases implicating unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132.

*Bruen* also confirmed some additional points that inform our analysis. First, the Court said (not for the first time) that the Arms protected by the Second Amendment are not limited to those that were in existence at the time of its ratification, 1791, or at the time the Fourteenth Amendment took effect, 1868. *Id.* Second, the search is for a historical regulation that is *relevantly similar*, not identical. Bearing in mind that "the *central component*" of the Second Amendment right is individual self-defense, *id.* at 2133 (quoting *McDonald*, 561 U.S. at 767 (emphasis in original)), the question is whether the modern and historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified," *id.* And the Court made it clear that this search was a meaningful one, not just a subterfuge for either upholding or striking down all modern laws:

> [A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risk[s] endorsing

> outliers that our ancestors would never have ac-
> cepted. On the other hand, analogical reasoning
> requires only that the government identify a
> well-established and representative historical
> *analogue*, not a historical *twin*. So even if a mod-
> ern-day regulation is not a dead ringer for his-
> torical precursors, it still may be analogous
> enough to pass constitutional muster.

*Id.* (quotation and citation omitted, and second alteration and emphases in original). Finally, the Court's decision in *Bruen* builds on, rather than disturbs, *Heller* and *McDonald*. See *id.* at 2157 (Alito, J., concurring); *id.* at 2161 (Kavanaugh, J., concurring). Justice Alito in particular took care to make this point when he wrote "[n]or does [*Bruen*] decide anything about the kinds of weapons that people may possess." *Id.* at 2157 (Alito, J., concurring). *Bruen* simply "made the constitutional standard endorsed in *Heller* more explicit" and applied it to the handgun regulation at issue. *Id.* at 2134.

Our task is to apply *Bruen*'s methodology to the four laws before us. We begin by assessing whether the assault weapons and large-capacity magazines described in those laws are Arms for purposes of the Second Amendment. If not, then the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic process. If they are properly characterized as Arms, then we must proceed to *Bruen*'s second step, at which the governments bear the burden of proof, and determine whether these laws pass muster.

### III.   Application to the Cases

### A. Are the Covered Weapons "Arms"?

We begin by looking at the "plain text" of the Second Amendment to see whether the assault weapons and large-capacity magazines (terms that we, like the parties, continue to use as short-hand for the many items covered by these laws) fall within the scope of the "Arms" that individual persons are entitled to keep and bear. Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense. That is not to say that there are no other lawful uses for weapons—sporting uses, collection, and competitions come to mind as examples. But the constitutional protection exists to protect the individual right to self-defense, and so that will be our focus.

Our starting point is, once again, *Heller*. It began by interpreting the object of the Second Amendment right: Arms. See 554 U.S. at 581. It is worth a close look at this part of the opinion:

> The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American

Dictionary of the English Language (1828) (re-printed 1989) (similar).

The term was applied, then as now, to *weapons that were not specifically designed for military use and were not employed in a military capacity.* For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays,* &c. and not bear other arms." … Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that all firearms constituted "arms." 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794) (emphasis added).

554 U.S. at 581–82 (first emphasis and ellipsis added, and "hereinafter" parentheticals omitted). Summarizing, the Court said that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id.* at 582.

But what exactly falls within the scope of "bearable" Arms? Not machineguns, the Court said, because they can be dedicated exclusively to military use. See *id.* at 624. Yet a normal person can certainly pick up and carry a machinegun, or for that matter the portable nuclear weapons we mentioned at the outset. "Bearable" thus must mean more than "transportable" or "capable of being held." See *id.* at 627 (discussing "weapons that are most useful in military service—M16 rifles and the like," which "may be banned").

The Court's comments about the role of the militia shed light on the scope of the term "Arms." It explained that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. It then concluded that "the Second Amendment does *not* protect those weapons *not* typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right." *Id.* at 625 (emphasis added). We take from this that the definition of "bearable Arms" extends only to weapons in common use for a lawful purpose. That lawful purpose, as we have said several times, is at its core the right to individual self-defense.

This approach is consistent with the historical antecedents on which the Second Amendment was based. Chief among those was the 1689 English Bill of Rights, which is a key precursor to the bills of rights in the U.S. state and federal constitutions. The 1689 Bill of Rights "explicitly protected a right to keep arms for self-defense." *McDonald*, 561 U.S. at 768. Similarly, Blackstone explained that at the root of the right to bear arms, there is a "natural right of resistance and self-preservation," and "the right of having and using arms for self-preservation and defence." *Heller*, 554 U.S. at 594 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES *139, *140). State constitutional protections from the Founding Era confirm this understanding. As *Heller* observed, "nine state constitutional provisions written in the 18th century or the first two decades of the 19th … enshrined a right of citizens to bear arms in defense of themselves and the state or bear arms in defense of himself and the state." 554 U.S. at 584–85, 585 n.8 (citing the state constitutions of Pennsylvania, Vermont, Kentucky, Ohio,

Indiana, Mississippi, Connecticut, Alabama, and Missouri) (quotations omitted).

In order to show a likelihood of success on the merits, the plaintiffs in each of the cases before us thus have the burden of showing that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes. This search for the correct meaning of "Arms" for the Second Amendment is consistent with our approach to its companions in the Bill of Rights. When interpreting the text of a constitutional provision or a statute, we often resort to contemporaneous dictionaries or other sources of context to ensure that we are understanding the word in the way its drafters intended. In Fourth Amendment cases, we ask whether the place or item searched falls within the Amendment's scope. See, *e.g.*, *California v. Ciraolo*, 476 U.S. 207, 213–14 (1986) (aerial view of backyard). For purposes of the Sixth Amendment, before we apply the Confrontation Clause we must ensure that a particular statement was testimonial. See, *e.g.*, *Ohio v. Clark*, 576 U.S. 237, 243–44, 247 (2015) (child's responses to questions from a teacher). The famous Fifth Amendment right against compulsory self-incrimination attaches only if the person is in custody, despite no mention of custody in the "plain text" of the Amendment. See, *e.g.*, *New York v. Quarles*, 467 U.S. 649, 654 (1984).

We find substantial support for the proposition that the Arms protected by the Second Amendment do not include weapons that may be reserved for military use. We already have pointed to language in the Supreme Court's opinions to

this effect.[6] The dissent, relying heavily on *Staples v. United States*, 511 U.S. 600 (1994), contends that the Court has already decided that the AR-15 is in common use, and thus that the weapon is presumptively immune from regulation. See *post* at 67. We see no such holding in *Staples*. That case had nothing to do with the Second Amendment, which is mentioned nowhere in the opinion. The Court handed down the *Staples* decision five months *before* Congress enacted the Federal Assault Weapons Ban, when as a matter of federal law it was lawful to own an AR-15. (We assume that this statute is of little relevance to our historical inquiry, given the Supreme Court's insistence that the relevant time to consult is 1791, or maybe 1868, not the late 20th century.) The status of the AR-15 at the time *Staples* was decided provides a ready explanation for why the Court asserted (with no empirical support) that the AR-15 is among the weapons that have been "widely accepted as lawful possessions." 511 U.S. at 612. Interestingly, the *Staples* Court contrasted the AR-15s with grenades, the possession of which it said "is not an innocent act." *Id.* at 610 (quotation omitted). It said the same about "machineguns, sawed-off shotguns, and artillery pieces." *Id.* at 611. Overall, we see

---

[6] We note, too, that this court was not the first to observe the line that *Heller* recognized, and which was applied to the states in *McDonald*. For example, over a decade ago, and three years before *Friedman*, one scholar of the Second Amendment wrote that "*Heller* and *McDonald* … focused on the right of a law-abiding person to have a handgun in his or her home for self-protection," but "[n]either case foreclosed reasonable gun regulations," including "bans on military weapons wholly unnecessary for ordinary self-defense," "limits on the size of gun clips," and "registration and permit requirements." See Akhil Reed Amar, *Gun Control After Newtown* (Dec. 26, 2012), *reprinted in* THE CONSTITUTION TODAY: TIMELESS LESSONS FOR THE ISSUES OF OUR ERA 230, 231 (2016).

nothing in *Staples* that decides whether the Second Amendment protects AR-15s, though we do find much in the opinion that reinforces the line we discern from *Heller*, and which is confirmed by history.

When we compare the AR-15s and other semiautomatic weapons covered by the Act and its counterparts, we come to the same conclusion. Indeed, we asked the plaintiffs at oral argument to explain what distinguishes AR-15s from M16s, the military's counterpart that is capable of both fully automatic operation and semiautomatic operation. The question is important precisely because *Heller* itself stated that M16s are not among the Arms covered by the Second Amendment; they are instead a military weapon. See 554 U.S. at 624, 627.

The plaintiffs' responses to our question were unconvincing. They argued, for instance, that civilians do not regard machineguns as useful for self-defense, but that is because they cannot purchase machineguns. It is not too much of a stretch to think that some people might like the fully automatic feature of a machinegun, if they were hoping to defend their families, their property, and themselves from invaders. The plaintiffs also noted that machineguns are more expensive than semiautomatic weapons, but we cannot believe that an item's entitlement to constitutional protection depends on its price. Finally, with a nod to the "lawful use" criterion, the plaintiffs said that when machineguns were available to civilians (early in the 20th century), they were primarily used by criminals. But this tells us nothing about how use of those

guns would have evolved, had they remained legal and read-
ily available.[7]

Coming directly to the question whether the weapons and
feeding devices covered by the challenged legislation enjoy
Second Amendment protection, at the first step of the *Bruen*
analysis, we conclude that the answer is no. We come to this
conclusion because these assault weapons and high-capacity
magazines are much more like machineguns and military-
grade weaponry than they are like the many different types
of firearms that are used for individual self-defense (or so the
legislature was entitled to conclude).[8] Indeed, the AR-15 is al-
most the same gun as the M16 machinegun. The only mean-
ingful distinction, as we already have noted, is that the AR-15
has only semiautomatic capability (unless the user takes ad-
vantage of some simple modifications that essentially make it
fully automatic), while the M16 operates both ways. Both

---

[7] It appears that there is a large and growing demand for guns in gen-
eral. Since 1986, the number of guns manufactured each year has almost
quadrupled, from around 3 million in 1986 to almost 11 million in 2013.
See Scott Horsley, *Guns in America, by the Numbers*, NPR (Jan. 5, 2016),
https://www.npr.org/2016/01/05/462017461/guns-in-america-by-the-
numbers. There is no reason to think that machineguns would not have
followed the same pattern, had they been lawful in civilian hands.

[8] Obviously, many weapons are "dual use": private parties have a
constitutionally protected right to "keep and bear" them and the military
provides them to its forces. In this sense, there is a thumb on the scale in
favor of Second Amendment protection. When we refer to "military"
weapons here, we mean weapons that may be essentially reserved to the
military.

weapons share the same core design, and both rely on the same patented operating system.[9]

The similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 by adding a "bump stock" (as the shooter in the 2017 Las Vegas event had done) or auto-sear to it, thereby making it, in essence, a fully automatic weapon. In a decision addressing a ban on bump stocks enacted by the Maryland legislature, another federal court found that bump-stock devices enable "rates of fire between 400 to 800 rounds per minute." *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 404 (D. Md. Nov. 16, 2018) (quotation omitted). To the same effect, the Fourth Circuit noted that "[t]he difference between the fully automatic and semiautomatic versions of [the AR-15 and AK-47] is slight. That is, the automatic firing of all the ammunition in a large-capacity thirty-round magazine takes about two seconds, whereas a semiautomatic rifle can empty the same magazine in as little as five seconds." *Kolbe*, 849 F.3d at 125. The District of Columbia Circuit also noted that "semiautomatics … fire almost as rapidly as automatics." *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011), *on remand from Heller*, 554 U.S. 570; see also ATF Ruling 2006-2, at 2 (Dec. 13, 2006) (discussing a device (apparently the "Akins Accelerator," an early bump-stock device) that "is advertised to fire approximately 650 rounds per minute").

---

[9] See ARMALITE, INC., *Technical Note 54: Direct Impingement Versus Piston Drive* (July 3, 2010), available at https://wayback.archive-it.org/all/20120905024032/http://www.armalite.com/images/Tech%20Notes%5CTech%20Note%2054,%20Gas%20vs%20Op%20Rod%20Drive,%20020815.pdf.

There are a few other differences between the AR-15 and the M16, but none that is relevant. The M16 has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of "only" 300 rounds per minute—unless, as we have just noted, it is modified with, for example, a bump stock or a "binary" trigger, which can double the rate at which semiautomatic weapons can be fired. Both models use the same ammunition, deliver the same kinetic energy (1220–1350 foot-pounds), the same muzzle velocity (2800–3100 feet per second), and the same effective range (602–875 yards). And these comments apply with equal force to the high-capacity handguns that are restricted by these laws. The latter are almost indistinguishable from the 17- or 21-round M17 and M18 pistols that are standard-issue in the military.

But what about the possibility that the AR-15 (and its many cousins covered by the Act) *as sold* is an Arm, even though simple modifications can transform it into a military weapon? On the one hand, this might support an argument against the Act, which focuses initially on the product as sold. On the other hand, there is a serious question whether the legislature sought to prevent users from deconstructing weapons into (or assembling weapons from) their constituent parts in order to evade the core regulation. If the AR-15 by itself is not a machinegun because it fires "only" at the rate of 300 rounds per minute, and the auto-sear is also not a machinegun because it is just a component that holds a hammer in the cocked position, that would be a road map for assembling machineguns and avoiding legitimate regulations of their private use and carry. A question of this nature is raised in *VanDerStok v. Garland*, No. 4:22-cv-00691-O, 2023 WL 4539591 (N.D. Tex. June 30, 2023), *appeal docketed*, No. 23-10718, 2023 WL 4945360 (5th Cir. July 24, 2023), *and stay pending appeal granted sub nom.*

*Garland v. Vanderstok*, No. 23A82, 2023 WL 5023383 (U.S. Aug. 8, 2023), where the Supreme Court has issued a stay of a district court's order vacating a federal "ghost gun" regulation, 87 Fed. Reg. 24652 (Apr. 26, 2022). See also *Garland v. Blackhawk Mfg. Grp., Inc.*, No. 23A302, 2023 WL 6801523 (U.S. Oct. 16, 2023) (vacating a second injunction limited to the parties).

Neither the parties nor the evidence before us addressed these points, but the district courts may explore them as the cases move forward. Better data on firing rates might change the analysis of whether the AR-15 and comparable weapons fall on the military or civilian side of the line. We note in this connection that it is one thing to say that the AR-15 is capable of firing at a rate of 300 rounds per minute and the comparable rate for the M16 is 700 rounds per minute, but quite another to address actual firing capacity, which accounts for the need to change magazines. No one here has suggested that the M16 comes with a 700-round magazine, or for that matter that the AR-15 comes with a 300-round magazine. Either one must be reloaded multiple times to fire so many rounds. Factoring in the reloading time, the record may show that the two weapons differ more—or less—than it appears here.

Turning now to large-capacity magazines, we conclude that they also can lawfully be reserved for military use. Recall that these are defined by the Act as feeding devices that have in excess of 10 rounds for a rifle and 15 rounds for a handgun. Anyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size. Thus, the person who might have preferred buying a magazine that loads 30 rounds can buy three 10-round magazines instead.

Based on the record before us, we are not persuaded that the AR-15 is materially different from the M16. *Heller* informs

us that the latter weapon is not protected by the Second Amendment, and therefore may be regulated or banned. Because it is indistinguishable from that machinegun, the AR-15 may be treated in the same manner without offending the Second Amendment.

We conclude this portion of the opinion by stressing again that this is just a preliminary look at the subject. That assessment persuades us, as it did Judges Kendall and Jenkins, that the plaintiffs have not shown a strong likelihood of success on the merits. But, as we previously have recognized, Second Amendment challenges to gun regulations often require more evidence than is presented in the early phases of litigation. See *Atkinson v. Garland*, 70 F.4th 1018, 1023–25 (7th Cir. 2023) (vacating the district court's order dismissing a Second Amendment challenge to a federal statute and remanding with a list of specific questions to consider as the case proceeded). There thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals.

## B.  Historical Tradition

Although we are satisfied that these appeals can be resolved at the first step of the *Bruen* framework—are the weapons among the Arms protected by the Second Amendment—for the sake of completeness we now turn to the question whether, if the weapons covered by the statutes before us ought to be considered bearable "Arms," the laws nonetheless pass muster under *Bruen*'s second step. In short, are these laws consistent with the history and tradition of firearms regulation? Here, too, at the preliminary injunction stage, we

conclude that the plaintiffs have not shown the necessary likelihood of success on the merits.

In discussing whether these assault weapons and large-capacity magazines are Arms protected by the Second Amendment, we have (as instructed by *Bruen*) confined ourselves to textual considerations. There is another aspect of the *Bruen* framework, which is whether the regulated weapons are "in common use." There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two. The plaintiffs argue that it belongs at the second step. We will assume (without deciding the question) that this is a step two inquiry, where the state bears the burden of proof. Even with that leeway, we do not find this factor to be very helpful.

In this respect, we find the analysis in *Friedman* to be particularly useful, and unlike the district courts, we do not believe that the relevant portion was undermined by *Bruen*. We recognized in *Friedman* that "common use" is a slippery concept. Suppose, for example, a new type of handgun is introduced to the market on January 1, 2024. As of that day, zero guns of that type have been sold. Yet if its characteristics are analogous to those of the many other types of handguns available for consumers, no one would say that this new handgun was not within the class of Arms protected by the Second Amendment. At the other end of the spectrum, consider the actual case of machineguns, which for a time were available for civilian purchase, but which were eventually withdrawn from that market. However popular machineguns might have been, either in organized crime circles or more generally, because their characteristics were military in nature, the decision to reserve them to military use was within the power of the legislature.

The dissent repeatedly makes the point that the assault weapons covered by the challenged legislation are obviously in common use, because there are so many in private hands. Indeed, the dissent's argument boils down to two propositions: first, it contends that the fact that many people own assault weapons insulates them from regulation; and second, it makes the surprising assertion that assault weapons are not particularly dangerous. The latter proposition finds no empirical support in the record, and the former, as we will explain, does not carry the day.

The plaintiffs present basically the same argument. One brief asserts that at least 20 million AR-15s and similar rifles are owned by some 16 million citizens (though they do not specify how many of these owners would fall within the large carveout created by the grandfather and the trained professional exceptions to the Act). The plaintiffs also assert that at least 150 million magazines with a capacity greater than 10 rounds have been bought for private use. (The state criticizes these numbers for being based, it says, on "an unpublished, non-peer-reviewed paper recounting an online survey that does not disclose its funding or measurement tools." We have no need for present purposes to resolve that dispute.) Cook County offers a different perspective, noting that of all the firearms in the country, only 5.3% are assault weapons, and that percentage includes those held by law-enforcement agencies. One is reminded of Mark Twain's apocryphal remark, "There are three kinds of lies: Lies, Damned Lies, and Statistics."

For the reasons set forth in more detail in *Friedman*, we decline to base our assessment of the constitutionality of these laws on numbers alone. Such an analysis would have

anomalous consequences. The problem with this approach can be seen in the case of the AR-15. When, in 1994, the Federal Assault Weapons Ban made civilian possession of AR-15s (among other assault weapons) unlawful, see Pub. L. No. 103-322, § 110102, 108 Stat. 1796, 1996, few civilians owned AR-15s. But in 2004, after the legislation was allowed to expire pursuant to its sunset provision, *id.* § 110105(2), 108 Stat. at 2000, these weapons began to occupy a more significant share of the market. Indeed, most of the AR-15s now in use were manufactured in the past two decades.[10] Thus, if we looked to numbers alone, the federal ban would have been constitutional before 2004, but unconstitutional thereafter. This conclusion is essential to the plaintiffs' position, yet it lacks both textual and historical provenance.

As this example illustrates, the idea of "common use" cannot be severed from the historical scope of the common-law right that the Second Amendment was designed to protect against encroachment. In other words, the relevant question is what are the modern analogues to the weapons people used for individual self-defense in 1791, and perhaps as late as 1868. This would exclude the weapons used exclusively by the military—and every Framer of the Second Amendment was well aware by 1791 that the King of England had an impressive standing army, and that such weapons existed. The weapons used for self-defense are the ones that *Heller*, *McDonald*, *Caetano*, and *Bruen* had in mind—not a militaristic

---

[10] See Aaron O'Neill, *Annual Share of AR-15 Assault Rifles in the Total Number of Firearms Manufactured in the United States from 1990 to 2020*, STATISTA (June 2, 2023), https://www.statista.com/statistics/1388010/share-ar-15-united-states-firearm-production-historical/.

weapon such as the AR-15, which is capable of inflicting the grisly damage described in some of the briefs.

*Bruen* recognized that even Arms (*i.e.*, non-militaristic weapons) may be regulated, as long as the regulation is "part of an enduring American tradition of state regulation." 142 S. Ct. at 2155. A regulation is a part of this tradition if one can provide answers to two questions: (1) how, and (2) why, does a given regulation "burden a law-abiding citizen's right to armed self-defense"? *Id.* at 2133. With respect to the "how" question, judges are instructed to consider "whether modern and historical regulations impose a comparable burden" on that right. *Id.* For all its disclaiming of balancing approaches, *Bruen* appears to call for just that: a broader restriction burdens the Second Amendment right more, and thus requires a closer analogical fit between the modern regulation and traditional ones; a narrower restriction with less impact on the constitutional right might survive with a looser fit. It is at this stage that many courts, as well as the state parties here, point to the long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices. (The regulations we list below are representative of this tradition.) The dissent cannot deny that regulation existed; it relies only on the fact that the particulars of those regulations varied from place to place, and that some were more absolute than others. But the same is true in our case. The laws before us have one huge carve-out: people who presently own the listed firearms or ammunition are entitled to keep them, subject only to a registration requirement that is no more onerous than many found in history. In addition, as we noted at the outset, the laws do not purport to regulate many other special uses. This

is enough, in our view, to satisfy the "how" question *Bruen* identified.

The "why" question is another one that at first blush seems hard to distinguish from the discredited means/end analysis. But we will do our best. *Bruen* makes clear that the question whether a burden is "comparably justified" cannot be answered by pointing to the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt. See *id.* at 2133, 2129. The dissent chooses to take a purposive approach to this question: what were the reasons motivating the historical regulations, and do they map well onto the reasons behind the modern law? We confess to some skepticism about any test that requires the court to divine legislative purpose from anything but the words that wound up in the statute. Legislator A may have had one goal; Legislator B may have had another; and Legislator C might have agreed to vote for one bill in exchange for a reciprocal vote for Legislator D's pet project later. That is why, as the author of *Heller* reminded us, "The text is the law, and it is the text that must be observed." ANTONIN SCALIA, A MATTER OF INTERPRETATION 22 (1997).

The best one can say is that if the text of the legislation evinces its purpose (perhaps in an introductory Statement of Purpose, which many bills contain, or in some other prefatory provision), that is a valid source to consult in answering the "why" question. When we consult the text of the Act, we find the best indication of its purpose in its name: "Protect Illinois Communities Act." See Pub. Act. 102-1116, at § 1 (2023). *Cf. Johnson v. Robison*, 415 U.S. 361, 377 (1974) (noting that the name of a statute can emphasize its purpose). Historical regulations show that at least since the Founding there has been

an unbroken tradition of regulating weapons to advance similar purposes.

Once again, the dissent cannot dispute the existence of this enduring American tradition. It tries to escape it, asserting that "stop[ping] a mass casualty event," or perhaps "stopping escalating gun violence," is the purpose of the statute, *post* at 71, 74, yet it points to nothing in the Act that supports either of these specific characterizations. To be sure, the dissent notes that the bill enacted by the City of Naperville recites a few of the many mass shootings that have occurred during the last decade. See *post* at 71 n.13.[11] But the bill also expressly states that the purpose of the ordinance is to protect public health, safety, and welfare. See City of Naperville, Ill., Ordinance No. 22-099, at 4 (Aug. 16, 2022). The mass-shooting details appear to be nothing more than particular examples illustrating that broader purpose. The state's attorney also informs us that the legislation was enacted after the Highland Park July 4 massacre. But we have not rested our opinion on this point, because in our view it comes too close to the means/end scrutiny that *Bruen* rejected. In any event we do not think it is appropriate to rely on extratextual considerations to answer the "why" question. The issue, whether we separate out "how" and "why" or we consider them a unified test, is whether the tools the legislature used were limited to those that the Second Amendment left for it, after (as the Court said in *Heller*, 554 U.S. at 635, and *Bruen*, 142 S. Ct. at 2133 n.7) the Second Amendment itself performed the

---

[11] Indeed, the dissent relies *solely* on the municipal bill's recitations as proof of the state statute's purpose. It is quite the puzzle to try to square this interpretive method with the dissent's lengthy criticism of our brief invocation of the name of the Act. See *post* at 63-65.

necessary means/end balancing. As we have explained, we think that the legislatures involved here did stay within those boundaries.

Harking back to our examination of covered Arms, we find the distinction between military and civilian weaponry to be useful for *Bruen*'s second step, too. Both the states and the federal government have long contemplated that the military and law enforcement may have access to especially dangerous weapons, and that civilian ownership of those weapons may be restricted.[12] Many other weapons remain that are more universally available. That is enough to assure us that we are not creating some unbounded "military veto" over the types of Arms that can be regulated. History and tradition leave no doubt that certain weaponry is for the state only: weapons such as the grenades, the machineguns, the artillery pieces, and the like mentioned in *Staples.* See 511 U.S. at 611–12. (And recall that the laws before us carve out not only the military, but police and security forces too, from their coverage.) And, as we now show, the distinction between the two uses is one well rooted in our history.

The following examples suffice to make the point:

---

[12] We realize that all guns are dangerous when used as intended: a gunshot wound may be fatal or life-threatening. The Centers for Disease Control and Prevention estimate that 48,830 people died as a result of a firearm in 2021. See CENTERS FOR DISEASE CONTROL AND PREVENTION, *National Center for Health Statistics: All Injuries* (Sept. 13, 2023), https://www.cdc.gov/nchs/fastats/injury.htm. But the record indicates that there are important differences in the lethality of the military-grade weapons, as compared with guns that are commonly owned and used for self-defense and other lawful purposes.

- In 1746, Boston outlawed the discharging of any cannon, gun, or pistol within city limits, but it explained that soldiers were still permitted to discharge weaponry on their training days. See Chapter 11—An Act to Prevent the Firing of Guns Charged with Shot[t] or Ball in the Town of Boston, §§ 1–3, *in* 3 THE ACTS AND RESOLVES OF THE PROVINCE OF THE MASSACHUSETTS BAY 1742-1756, at 309 (1878).

- Other cities, such as Cleveland, Ohio, implemented similar ordinances throughout the 19th century, again exempting military companies during drills. See Chapter 33—Fire Arms, §§ 417–423, *in* ORDINANCES OF THE CITY OF CLEVELAND 136–37 (H.L. Vail & L.M. Snyder, eds., 1890).

- There are dozens of examples of Bowie knife regulations, forbidding or limiting the use of these dangerous weapons. Several of those featured military exceptions. In 1884, for example, Arkansas outlawed the sale of all dirks, Bowie knives, cane-swords, metal knuckles, and pistols, except as for use in the army or navy of the United States. See Chapter 53—Carrying Weapons, §§ 1907–1909, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield, ed., 1884).

- Several city ordinances in the late 1800s followed suit, restricting the carry of a wide array of dangerous and concealable weapons (slingshots, metal knuckles, Bowie knives,

daggers, pistols, and clubs), but exempting "peace officers" and "conservator[s] of the peace." See Chapter 6—Offenses Against the Peace of the City, § 182, *in* THE REVISED ORDINANCES OF PROVO CITY 106–07 (1877); Chapter 534—Ordinances of Baltimore, § 742A, *in* THE BALTIMORE CITY CODE 297–98 (John Prentiss Poe, ed., 1893).

- The federal government continued this tradition when it began passing gun control laws. The National Firearms Act of 1934 imposed taxation and registration requirements on all guns, but it exempted transfers to the U.S. government, states, territories, political subdivisions, and peace officers. See Pub. L. No. 73-474, §§ 1-12, § 13, 48 Stat. 1236, 1236-40, 1240 (1934).

- Federal restrictions expanded in 1968, when sale and delivery of destructive devices (defined as an "explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device") and machineguns were severely restricted. See Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 921(a)(4), § 922(b), 82 Stat. 197, 227, 230 (1968). Once again, these provisions did not apply to items sold to the United States or to any individual state. *Id.* § 925(a), 82 Stat. at 233.

- Machineguns were banned by the Firearm Owners' Protection Act of 1986. Since then,

civilian ownership has been capped at pre-1986 levels and only military and law enforcement have access to these weapons. See Pub. L. No. 99-308, § 102(9), 100 Stat. 449, 453 (1986).

In short, there is a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use. The legislation now before us respects and relies on that distinction.

## IV.    Concluding Observations

We conclude with a few remarks about several additional issues in some of these cases that do not require immediate attention, and a reminder about the limits on our ruling.

First, we briefly comment on Herrera's challenge to the constitutionality of the registration requirement that implements the grandfather exemption. He regards it as a burden on his Second Amendment rights, and he worries that it may in the future lead to confiscatory acts on the part of the state. If we are correct in our prediction that the state will prevail in its defense of the Act against the Second Amendment arguments, then the registration requirement will be valid as long as it can withstand rational basis review. At this juncture, we see nothing particularly onerous about it, though as with everything we have said, this is a preliminary assessment. Herrera has until the end of 2023 to file the necessary forms, and if he does so, he may retain all of the covered weapons he already owns; the Act will prohibit only his acquisition of additional assault weapons or high-capacity feeding devices. For

its own reasons, the dissent agrees with us that the registration requirement should not be enjoined. See *post* at 76.

Second, in this court none of the parties has developed any coherent argument that would distinguish restrictions on possession, on the one hand, from restrictions on sale or manufacture, on the other. One of the parties in *Bevis* is a gun store, but the implications of that have yet to be addressed. We thus have no comment on it.

Finally, we have no need to decide whether an alleged Second Amendment violation gives rise to a presumption of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad. Given our decision that the plaintiffs have not shown that they have a strong likelihood of success on the merits, we think it best to save this point for another day. We also have no comment on the other two parts of the *Winter* inquiry: where the balance of equities lies, and what the public interest dictates.[13]

We close with an important reminder. Nothing that we have said here indicates that any state or municipality *must* enact restrictions on the ownership of assault weapons or high-capacity magazines. Unless preemptive federal legislation requires otherwise, this is an issue for the political process in each jurisdiction. The people of some states may find

---

[13] The governmental parties devoted considerable attention in their briefs to the horrors of the mass shootings that have occurred with distressing regularity throughout the country. Illinois reports that the mass shooting in the town of Highland Park on July 4, 2022, in which seven people were killed and another 48 were injured, inspired the Act. We have not relied on this point, however, because, as we have mentioned, it appears to depend on the type of means/end analysis that *Bruen* disapproved.

the arguments in favor of a lack of restrictions to be persuasive; the people of other states may prefer tighter restrictions. As long as those restrictions do not infringe on the constitutionally protected right to keep and bear the Arms covered by the Second Amendment, either choice is permissible. In the cases now before us, however, the plaintiffs have not shown a likelihood of success on the merits, based on the fact that military weapons lie outside the class of Arms to which the individual right applies.

In Nos. 23-1353 and 23-1793, we AFFIRM the district courts' orders denying preliminary injunctive relief. In Nos. 23-1825, 23-1826, 23-1827, and 23-1828, we VACATE the district court's order granting preliminary injunctive relief. We also confirm that the stay we issued in these appeals will remain in effect until our mandate issues.

SO ORDERED.

**APPENDIX**

| Jurisdiction | Actions Prohibited | Firearms Covered | Magazines Covered |
|---|---|---|---|
| Illinois | • Manufacture<br><br>• Delivery<br><br>• Sale<br><br>• Purchase<br><br>• Possession (pre-existing possession and private post-Act use are permissible if registration requirements are met) | • Semiautomatic rifles that have one or more assault weapon-like modifications<br><br>• Semiautomatic pistols that have one or more assault weapon-like modifications<br><br>• Semiautomatic shotguns with a revolving cylinder or that have one or more assault weapon-like modifications<br><br>• Various assault weapons listed by name | • Rifles—over 10 rounds<br><br>• Handguns—over 15 rounds |
| Naperville | • Commercial sale | • Semiautomatic rifles that can accept more than 10 rounds or that have one or more assault weapon-like modifications<br><br>• Devices that accelerate the rate of fire of a semiautomatic rifle<br><br>• Various assault weapons listed by name | N/A |

| Cook County | <ul><li>Manufacture</li><li>Sale</li><li>Offer or display for sale</li><li>Give</li><li>Lend</li><li>Transfer of ownership</li><li>Acquire</li><li>Carry</li><li>Possession</li></ul> | <ul><li>Semiautomatic rifles that have one or more assault weapon-like modifications</li><li>Semiautomatic pistols that have one or more assault weapon-like modifications</li><li>Semiautomatic shotguns with a revolving cylinder or that have or one more assault rifle-like modifications</li><li>Combination kits from which an assault weapon can be assembled</li><li>Various assault weapons listed by name</li></ul> | <ul><li>Magazines over 10 rounds</li></ul> |
|---|---|---|---|

| Chicago | • Import<br>• Sale<br>• Manufacture<br>• Transfer of ownership<br>• Possession | • Semiautomatic rifles with the ability to accept a detachable magazine and that have one or more assault weapon-like modifications<br>• Semiautomatic rifles that have a fixed magazine with the capacity to accept more than 10 rounds<br>• Devices that accelerate the rate of fire of a semiautomatic rifle<br>• Shotguns that have one or more assault weapon-like modifications<br>• Semiautomatic handguns that have one or more assault weapon-like modifications<br>• Various assault weapons listed by name | • Handguns—over 15 rounds |

BRENNAN, *Circuit Judge*, dissenting. The Second Amendment "right of the people to keep and bear Arms" is not a second-class right. Yet the State of Illinois and several Illinois municipalities have categorically banned law-abiding citizens from keeping and bearing a sweeping range of firearms and magazines. In a remarkable conclusion, the majority opinion decides that these firearms are not "Arms" under the Second Amendment. Because the banned firearms and magazines warrant constitutional protection, and the government parties have failed to meet their burden to show that their bans are part of the history and tradition of firearms regulation, preliminary injunctions are justified against enforcement of the challenged laws. I respectfully dissent.

# I

The Protect Illinois Communities Act, Pub. Act 102-1116, challenged in each case before us, dramatically redefines the legality of firearms and magazines in Illinois. It goes far beyond the prohibition of "assault rifles." The Act eliminates the ownership, possession, and use for self-defense of many of the most commonly-owned semiautomatic handguns, shotguns, rifles, and magazines. Exceptions to the Act are narrow.

Specifically, the Act covers firearms, magazines, and an endorsement process for registration. The Act bans the manufacture, delivery, sale, import, and purchase of a vast array of weapons, 720 ILL. COMP. STAT. §§ 5/24-1(a)(16), 75/24-1.9(a), 5/24-1.10(a)–(b), prohibiting them by their features, by their functions, and by name. The Act bans semiautomatic rifles with detachable magazines and one additional qualifying attachment, such as a pistol grip or a flash suppressor. *Id.* § 5/24-1.9(a)(1)(A). "[A]ll AR type[]" rifles are banned, including 43 named variants, such as the AR-15. The Act further prohibits

"copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." *Id.* § 5/24-1.9(a)(1)(J)(ii). It also bans almost 100 more rifles by name. *Id.* § 5/24-1.9(a)(1)(J).

The Act restricts various other firearms as well. For example, a law-abiding citizen in Illinois can no longer purchase semiautomatic pistols that have "a fixed magazine with the capacity to accept more than 15 rounds," regardless of any attachments. *Id.* § 5/24-1.9(a)(1)(D). The same goes for a semiautomatic shotgun with a fixed magazine holding more than five shells. *Id.* § 5/24-1.9(a)(1)(F)(v). The list of restricted weapons includes nearly all detachable magazines holding more than 10 rounds of ammunition for long guns and 15 rounds of ammunition for handguns. *Id.* § 5/24-1.10(a)(1)–(2). Many handguns, the "quintessential self-defense weapon" for the American people, *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008), come standard with magazines carrying more than 15 rounds. As with semiautomatic rifles, after banning pistols by their features, the Act bans "[a]ll AR type[] pistols" and approximately 40 semiautomatic pistols by name. 720 ILL. COMP. STAT. § 5/24-1.9(a)(1)(K).

Three municipal laws are also challenged, which are as or more restrictive than the Act. The City of Naperville ordinance is similar to the Act in most respects; both are challenged in *Bevis*. The Cook County and City of Chicago ordinances, challenged along with the Act in *Herrera*, are even broader. Cook County bans possession of "assault weapons," COOK COUNTY, ILL. CODE § 54-211 and § 54-212, which includes semiautomatic pistols with the capacity to accept a detachable magazine and contain a qualifying attachment (such

as a muzzle brake). The City of Chicago ordinance is similar. *See* CHI. MUN. CODE §§ 8-20-010, 8-20-075, 8-20-085.[1]

## II

The parties dispute whether the state, county, and city bans respect the constitutional right to keep and bear arms. In *New York State Rifle* & *Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court set forth the framework for addressing those disputes. Rejecting means-end scrutiny, the Court held: "When the Second Amendment's plain text

---

[1] The majority opinion uses the phrase "assault weapon" to simplify the covered arms. The appendix to the majority opinion uses a variety of terms to summarize the types of arms the four challenged laws categorically ban.

Still, the description in the appendix of the Act's ban is underinclusive in some ways. The Act bans semiautomatic rifles with fixed magazines over 10 rounds (unless it fires .22 rimfire and is loaded with a tubular mechanism). ILL. COMP. STAT. § 5/24-1.9(a)(1)(B). The appendix uses the phrase "[s]emiautomatic pistols that have one or more assault weapon-like modifications," most likely a reference to ILL. COMP. STAT. § 5/24-1.9(a)(1)(C). More precisely, the Act also bans semiautomatic pistols with fixed magazines over 15 rounds. *Id.* § 5/24-1.9(a)(1)(D). Not included in the appendix are bump stocks and binary triggers (a device enabling the firing of two-rounds per trigger pull), which are both prohibited by the Act. *Id.* § 5/24-1(a)(14).

The Cook County ordinance mirrors the Act's prohibitions, although it is stricter than the Act in that it bans semi-automatic handguns with fixed magazines over 10 rounds (as opposed to 15 rounds under the Act). COOK COUNTY, ILL. CODE § 54-211(2).

The City of Chicago ordinance is underinclusive in its description of the magazines covered. The ordinance prohibits any magazine holding greater than 15 rounds, encompassing magazines for all types of firearms (except for attached devices that only accept and operate with .22 rimfire ammunition), not just handguns. CHI. MUN. CODE § 8-20-010.

covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment states in part, "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The amendment presents several conditions for plain text coverage, which raise questions including:

- Is the regulated population a covered "people?" *See, e.g., Range v. Att'y Gen. United States*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc); *United States v. Sitladeen*, 64 F.4th 978, 983 (8th Cir. 2023); and
- Is the conduct regulated "keep[ing]" or "bear[ing]" arms? *See, e.g., Heller*, 554 U.S. at 582–92.

We consider another question: Are the instruments regulated "Arms"?

"Arms" in the Second Amendment is a broad term that "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. The term "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. When the plain text of the Second Amendment covers an individual's conduct, then the Constitution presumptively protects the conduct. *Bruen*, 142 S. Ct. at 2129–30. That presumptive protection is of all bearable instruments that facilitate armed self-defense, even those not in existence at the time of the Founding. *Id.* at 2132, 2143 (citing

*Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam), and *Heller*, 554 U.S. at 627).[2]

As an initial matter, magazines—ammunition feeding devices without which semiautomatic firearms cannot operate as intended—are "Arms." Such devices are required as part of the firing process. This court has recognized that corollaries to firearms fall within Second Amendment protection. *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)). Further, the Act's ban on magazines holding more than ten rounds for rifles and more than fifteen rounds for handguns effectively bans firearms that come standard with magazines over the limit.

As for the broader definition of "Arms," that term should be read as "Arms"—not "Arms in common use at the time." In *Heller*, the Supreme Court recognized a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" 554 U.S. at 627, which may be regulated—a point it repeated in *Bruen*, 142 S. Ct. at 2143.

The Court "did not say that dangerous and unusual weapons are not *arms*." *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) (emphasis in original) (ruling that Hawaii statute banning butterfly knives violated Second Amendment). To be

---

[2] When the Supreme Court issued *Bruen*, it vacated several federal appellate decisions upholding gun controls laws, remanding them for reconsideration. Two of them—*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*, 974 F.3d 237 (3d Cir. 2020)—concerned magazine limits of 10 rounds, and *Bianchi v. Frosh*, 858 F. App'x 645 (4th Cir. 2021) (per curiam) (unpublished), upheld Maryland's "assault weapons" ban.

sure, this does not mean that the Second Amendment bars governments from regulating weapons long held improper for civilian use. This reading of *Bruen* permits the government, for example, to preclude civilian ownership of military weaponry when the history and tradition of weapons regulation so dictates. As other examples, the government may prohibit sawn-off rifles and shotguns, which properly qualify as dangerous and unusual firearms as they are not ordinarily used by law-abiding citizens. *See Heller*, 554 U.S. at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."). But that distinction does not determine whether a weapon is an "Arm."

The government parties limit the Second Amendment right by importing the phrase "in common use" to assess whether firearms are "Arms." But their reading improperly restricts the constitutional right. The banned firearms propel bullets by explosive force from gunpowder, yet the government parties ask us to conclude that these rifles and pistols are not "Arms." As one amicus curiae submitted, "in common use" is a sufficient condition for finding arms protected under the history and tradition test in *Bruen*, not a necessary condition to find them "Arms."[3] The nature of an object does not change based on its popularity, but the regulation of that object can.

The government parties also incorrectly attempt to place a burden on the plaintiffs to show that the plain text of "Arms" includes the banned firearms. *Bruen* does not say that. Instead, *Bruen* states that when the Second Amendment's text

---

[3] *See* D.E. 99, Brief for Amici Curiae Idaho, *et al.,* at 6.

covers an individual's conduct, the Constitution presump-
tively protects it. 142 S. Ct. at 2126, 2129–30. It is undisputed
that the government then bears the burden of proof under
*Bruen*'s history and tradition framework.

Whether a firearm is "in common use" is asked as part of
the history and tradition analysis. At least two reasons sup-
port this reading. First, the "in common use" test in *Bruen* is
drawn from the "historical tradition" of restrictions on "dan-
gerous and unusual weapons." *Id*. at 2143. The test is not
drawn from a historical understanding of what an "Arm" is.
*Id*. at 2132. Second, if a weapon is an "Arm," it is only prima
facie protected by the Second Amendment. *Bruen*, 142 S. Ct.
at 2132 (quoting *Heller*, 554 U.S. at 582); *see Teter*, 76 F.4th at
949–50 (placing "in common use" test in history and tradition
test of *Bruen*).

The limitation of the Second Amendment right is ad-
dressed in *Bruen*'s history and tradition test. This requires the
government to identify well-established and representative
historical analogues to show that the modern regulation is
consistent with a historical tradition of firearms regulation.
*Bruen*, 142 S. Ct. at 2133. In performing this analogical inquiry,
it is critical to fly at the right level of generality. *Id.* ("[A]na-
logical reasoning under the Second Amendment is neither a
regulatory straightjacket nor a regulatory blank check."); *see*
J. HARVIE WILKINSON, COSMIC CONSTITUTIONAL THEORY 44
(2012). Fly too high, and we risk any historical firearms regu-
lation becoming an analogue. Under *Bruen*, courts must not
"uphold every modern law that remotely resembles a histor-
ical analogue." *Bruen*, 142 S. Ct. at 2133. (quoting *Drummond
v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). Fly too low, and
we risk myopia—nitpicking differences because a historical

regulation is not a "dead ringer." *Id.* We are looking for "a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Before reviewing the approach to decide whether a regulation is an analogical fit, it helps to address what history and tradition refer to here. "History" means that analogous laws must be "longstanding" and from the relevant "timeframe." *Id.* at 2131, 2133 (citing *Heller*, 554 U.S. at 626). "History" helps establish the public meaning of the Constitution as "understood ... when the people adopted" it. *Id.* (citing *Heller*, 554 U.S. at 634–35). The Court tells us that only two historical timeframes are relevant to the public understanding of the Second Amendment—the adoption of the Second Amendment in 1791 and the ratification of the Fourteenth Amendment in 1868. *Id.* at 2136. Laws enacted after the "end of the 19th century" must be given little weight. *Id.* at 2136–37 (cleaned up). "Tradition" means that the comparison must be to laws with wide acceptance in American society. *Id.* at 2136. Laws that enjoyed "widespread" and "unchallenged" support form part of our tradition. *Id.* at 2137.

In *Bruen*, the Court reaffirmed that "individual self-defense is 'the central component' of the Second Amendment right," *id.* at 2133 (citing *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)), and expressly identified two questions to assess the analogical strength of a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, *how* does the regulation limit the Second Amendment right, and *why* does it do so?

*How.* How a historical regulation addressed a particular problem, or whether it did at all, matters. "[I]f earlier

generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 2131. Whether a given regulation was ever enforced, and to what extent, can be relevant here as well. *Id.* at 2149.

Courts must also evaluate how historical "regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Modern regulations that impose a "comparable burden on the right of armed self-defense" are more likely to be upheld. *Id.*

In assessing these comparable burdens, we consider the breadth of the ban and the weapon banned. For the breadth of the ban, the more expansive the limitation, the greater the burden on the Second Amendment right, which necessarily requires a close analogical fit. For the weapon banned, the burden on the right to keep and bear arms necessarily correlates with whether the prohibited weapon is "in common use at the time" of regulation. *Id.* at 2128, 2134, 2143. So, it is natural that categorical bans of weapons in common use will require an even stronger analogical fit with historical regulations. *See id.* at 2143–44 (rejecting the analogical value of alleged colonial era categorical bans on "dangerous and unusual" weapons because handguns are "unquestionably in common use today").

*Why.* Why a historical regulation addressed a particular problem, or whether it did at all, is also key to evaluating its analogical value. In considering whether a historical regulation is an analogical fit, courts are to address whether the modern regulation and proposed historical analogue have comparable justifications for burdening the right to bear arms. *Id.* at 2133. If the reasons motivating the historical and

modern regulations differ, there is no analogue. *See id.* at 2140, 2144. Beyond doubt, this inquiry should not allow a return to interest balancing. *See id.* at 2131 (explaining that the Second Amendment itself "is the very *product* of an interest balancing by the people" (quoting *Heller*, 554 U.S. at 635)). Rather, the state's current rationale for arms regulation only matters insofar as a historical regulation was motivated by similar reasons. If not, the analogy fails. *See id.* at 2144 (discussing the context of the colonial New Jersey restrictions, in which land disputes between planters and the colony's proprietors caused planters to carry pistols).

The government can only defend a regulation by proving it is consistent with this country's history and tradition. *See Atkinson v. Garland*, 70 F.4th 1018, 1020–21 (7th Cir. 2023). Whether that history and tradition allows regulating firearms in sensitive places, for the mentally ill, and for felons, is currently under debate. *See, e.g.*, *United States v. Rahimi*, 61 F. 4th 443, 460–61 (5th Cir. 2023) (ruling that federal statute prohibiting possession of firearm by individual subject to domestic violence restraining order violates Second Amendment as inconsistent with historical tradition), *cert. granted* 143 S. Ct. 2688.

This understanding of the *Bruen* framework is different from that of my colleagues. First, the majority opinion acknowledges *Bruen*'s "in common use" language but criticizes it as spawning unworkable circularity issues: If the Second Amendment protects firearms in common use, then that right would turn on how quickly a state enacts regulations. If a firearm is outlawed quickly following its introduction to the market, then it has no chance of gaining common use and enjoys only limited or no Second Amendment protection. This

cannot be how the Second Amendment functions, the argument goes, as the speed of regulation should not bear on an arm's constitutionality.

This circularity concern is far less pressing when the "in common use" language is properly situated. Because that consideration plays into the history and tradition analysis—and not the scope of the Second Amendment's text—it is not an "on-off" switch for constitutional protection. Just because a weapon is not in common use does not mean it falls outside the text of the Second Amendment; and just because a weapon is in common use does not necessarily mean a government is barred from regulating it. Proper inquiry requires full examination of the government's evidence and historical analogues, keeping in mind that bans of weapons "in common use" are constitutionally suspect.

The Supreme Court certainly was not worried about circularity. In *Bruen*, the Court explicitly linked the Second Amendment analysis to "in common use." *See* 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 629) (explaining that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large'"). The Court reasoned that even if handguns were once "dangerous and unusual," such firearms "are unquestionably in common use today" and therefore receive robust Second Amendment protection. *Id.* at 2143. In *Caetano*, the Court addressed Second Amendment protections for a new electronic weapon. So many were in circulation (200,000 stun guns, far fewer than the approximately 25 million AR rifles) that the electronic weapon was deemed "commonly possessed by law-abiding citizens for lawful purposes … ." 577 U.S. at 420. We are not free to ignore

the Court's instruction as to the role of "in common use" in the Second Amendment analysis.[4]

Next, my colleagues disagree with my approach to *Bruen*'s "why" question, raising the specter of purposivism. The majority opinion urges respect for the text of a statute alone, which I share. Indeed, a fair reading of a statute always "requires an ability to comprehend the *purpose* of the text, which is a vital part of its context." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 33 (2012); *see also* John O. McGinnis, *The Contextual Textualism of Justice Alito*, 14 HARV. J. L. & PUB. POL'Y PER CURIAM, at 2 (2023) (describing Justice Alito's use of context in interpretation). This is certainly a different task than interpreting a statute by reference to the intent of its drafters, which I agree is an inappropriate job for judges.

Still, *Bruen* requires us to consider the historical context giving rise to the statute (the "why"). *Bruen* looks at history and tradition to determine "the content of the preexisting legal right to bear arms." Randy E. Barnett & Lawrence B. Solum, *Originalism After* Dobbs, Bruen, *and* Kennedy, 118 NW. U. L. REV. 433, 469 (2023). And *Bruen*'s history and tradition approach is a different endeavor than statutory interpretation.

Often a statute takes center stage for a purpose other than to discern the scope of its legal rule, even when determining whether it violates a constitutional right. *See Vill. of Arlington*

---

[4] The circularity argument also is not new. *See Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015). As Judge Manion explained in dissent, circularity concerns deal in the hypothetical more than the actual. *Id*. at 416 n.5.

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977) (considering whether a discriminatory purpose was a motivating factor in a city's zoning rules). For example, in *Bruen* the Court considered Henry VIII's "displeasure with handguns" due to his concern that they would "threaten[] Englishmen's proficiency with the longbow," which led to Parliament's passage of handgun restrictions. 142 S. Ct. at 2140. East New Jersey prohibited the concealed carry of pocket pistols in response to "'strife and excitement' between planters and the Colony's proprietors 'respecting titles to the soil.'" *Id.* at 2143–44. And *Heller* discusses the "public-safety reasons" behind several Colonial-era individual-arms-bearing statutes. *Heller*, 554 U.S. at 601.

When looking to the text in its "why" analysis, the majority opinion relies on the Act's title, Protect Illinois Communities Act. Set aside for the moment that "for interpretive purposes," courts should only rely on titles to "shed light on some ambiguous word or phrase" in the text. *See Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947). Titles and section headings have a short history in the Anglo-American interpretive tradition—legislatures did not always include the title while debating the act. *See* SCALIA & GARNER at 221. If there is serious doubt as to whether those titles and headings received a fair shake in the legislative process, relying on them would make little sense. One influential treatise implores judges to check a state's constitution for provisions that vouchsafe interpretive usefulness on a statutory title. *See id.* at 224.

As it turns out, the title of the Protect Illinois Communities Act has little interpretive utility. The Illinois Constitution has a provision grounding the title in the legislative process, but

there is serious doubt whether the legislature obeyed it here. The so-called three-readings clause states: "A bill shall be read by title on three different days in each house." ILL. CONST. art. IV, § 8(d). Reading rules exist precisely to ensure "that each House knows what it is passing and passes what it wants." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring) (explaining that the federal three-readings rule helps draw a line where debate ends and drafting begins).

Consider the procedural path of the Act, during which the Illinois legislature may very well have ignored the three-readings rule. *See Caulkins v. Pritzker*, No. 129453, 2023 WL 5156850, at *17 (Ill. Aug. 11, 2023) (White, J., dissenting). A group of firearms owners challenged the Act in Illinois state court, arguing it violated several provisions of the Illinois Constitution. *Id.* at *1. The three-readings clause is one of these provisions, and the Supreme Court of Illinois rejected that claim only because the plaintiffs failed to cross-appeal it, a jurisdictional error warranting dismissal. *Id.* This legislation began in the Illinois House with the title, "an Act concerning regulation," and its synopsis described changes to the state's insurance code. *Id.* at *17 (White, J., dissenting). The House read it three times by this title, then sent it to the Illinois Senate. *Id.* The Senate read it twice before the Senate adopted an amendment that "completely stripped the insurance provisions[,] … replaced them with the 'Protect Illinois Communities Act[,]'" and added the new bill's popular title. *Id.* The day the legislation became the "Protect Illinois Communities Act," the Senate read it for the first time under the new title and passed it. *Id.* The Act was returned to the House the day after

that and passed without a reading. *Id.* The Illinois Governor signed it later that day. *Id.*[5]

Though the Act's possible three-readings problem bears on neither the Second Amendment question nor the Act's legitimacy, it remains a good reason to be skeptical of the interpretive value of language extrinsic to the operative text. Instead, I focus on permissible indicators of meaning.

### III

Turning to this interlocutory appeal, the plaintiffs make a facial challenge to the Act and ordinances at the preliminary injunction stage. According to the Supreme Court in *Nken v. Holder*, 556 U.S. 418, 434 (2009), the two most important considerations at this stage are likelihood of success on the merits and irreparable harm. For the reasons explained below, plaintiffs have satisfied both considerations.

### A

As for likelihood of success on the merits, the firearms and magazines banned by the Act and ordinances are "Arms" under the plain text of the Second Amendment. These firearms and magazines are therefore presumptively protected.[6] The government parties embrace a contrasting, very narrow view of the scope of the Second Amendment. They would limit this constitutional right to the facts in *Heller* and *Bruen*. Yet, as

---

[5] The Illinois Supreme Court decided that the Act does not violate certain provisions of that state's constitution. *Caulkins,* 2023 WL 5156850, at *4–6. The court also ruled that a challenge based on the federal Second Amendment had been waived. *Id.* at *6.

[6] Debates about grenades or rocket launchers are off subject. Some military weaponry is covered by federal statute, *see* 18 U.S.C. ch. 44, which is not challenged here.

examples, the First and Fourth Amendments would surely not be read in such a cramped manner.

Under *Bruen*'s history and tradition test, the government parties bear the burden to show that the banned arms are not in common use—or in other words, are not dangerous and unusual—and to identify historical analogues. As described above, *Bruen* reviewed *Heller* and set forth its test to determine if regulations satisfied the "how" and "why" test. *Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 626–34).

The Act and ordinances here do not fall within a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see Bruen*, 142 S. Ct. at 2143. The banned arms are "in common use," including for self-defense, hunting, and sporting pursuits. Each side chooses its metric—regulators divide the banned guns by the total number of firearms, and gun owners use gross numbers of the banned guns and magazines. Under either measure, the banned weapons and magazines meet the definition of "common": "the quality of being public or generally used." BRYAN GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 179 (Oxford, 3d ed. 2011). More than 24 million AR rifles are estimated to be in circulation in this country.[7] Magazines number far more: in 2020 it was estimated that approximately 160 million pistol and rifle magazines with a capacity of 11 rounds or more were in U.S. consumer possession from 1990–2018.[8]

---

[7] *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation*, NAT'L SHOOTING SPORTS FOUND. (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/ [https://perma.cc/2LX6-UN3B].

[8] *Firearm Production in the United States*, NAT'L SHOOTING SPORTS FOUND. 7 (2020), https://www.nssf.org/wp-content/uploads/2020/11/IIR-

Federal courts have recognized that the AR-15 rifle is common. In *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court offered comments in dicta stating how common AR-15s were at that time in this country. That case, which did not address the Second Amendment, turned on the question of mens rea, and the Court decided that to convict a person of possession of an unregistered machinegun, the government must prove the defendant knew that it would fire automatically. *Id.* at 619. In *Staples*, the Court contrasted the semiautomatic AR-15 with the automatic M16. *Id.* at 602 n.1, 603. Acknowledging "a long tradition of widespread lawful gun ownership by private individuals in this country," the Court stated, "[e]ven dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation." *Id*. at 610–11. *Staples* contrasted ordinary firearms such as the AR-15 in that case with "machineguns, sawed-off shotguns, and artillery pieces," stating "guns falling outside those categories traditionally have been widely accepted as lawful possessions." *Id*. at 612.

Albeit pre-*Bruen*, two federal appellate courts also concluded that AR platform rifles are common. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten

---

2020-Firearms-Production-v14.pdf [https://perma.cc/3WK8-TVAV] (sum of pistol and rifle magazines with 11 or more rounds).

rounds are indeed in 'common use,' … ."). The firearms banned by the Act and ordinances here have achieved common use in the United States. They are not unusual.

As for magazines, *Heller* recognizes that ammunition feeding devices may store rounds in a way that the ammunition can be used immediately. 554 U.S. at 630. The Act and ordinances limit the number of rounds a magazine may contain to 10 and 15. Nothing in the record supports these arbitrary limits. "Large"- or "high"-capacity magazine is a relative term, as pistols may ship with magazine sizes ranging from 5 to 20 rounds, and common self-loading rifles have a standard magazine capacity of between 20 and 30 rounds.[9] The numbers chosen in the Act and ordinances do not track the gun market and are not "in common use."

Even if AR platform rifles were unusual, they are not more dangerous than handguns. (Recall the test is "dangerous *and* unusual." (emphasis added). *See id.* at 627; *Bruen*, 142 S. Ct. at 2143.) The semiautomatic mechanism in an AR-15 rifle is, in all material respects, the same as in a semiautomatic handgun. That mechanism is gas powered, and the impact of the pin firing the bullet pushes back the lock mechanism, ejects the

---

[9] David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 874 (2015) ("It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms."); *id.* at 859 ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Springfield, for example, ships a small handgun with a 5-round magazine. *See XD-S Mod.2 OSP 3.3″ Single Stack .45 ACP Handgun*, SPRINGFIELD ARMORY (2023), https://www.springfield-armory.com/xd-series-handguns/xd-s-mod-2-osp-handguns/xd-s-mod-2-osp-3-3-single-stack-45-acp-handgun [https://perma.cc/64NQ-KRWM].

old shell, and loads the new round from the magazine. If *Bruen* and *Heller* provide that semiautomatic handguns do not fail under the "dangerous" prong, the mechanism in the AR-15 must survive scrutiny. Indeed, a handgun could be viewed as more dangerous than an AR-15 rifle because the handgun is less accurate and more concealable.[10]

AR-15s are not more dangerous because of the projectile used. The regulations challenged here do not speak to the type of round employed, but to the capacity of the magazines and the rate of fire. In this respect, an AR-15 and a semiautomatic handgun are very similar. Controlling for the same caliber of round, the difference between a Glock semiautomatic pistol and an AR-15 is just the stock and barrel length. Their rate of fire depends on how fast a trigger can be pulled. On that metric, an AR-15 is closer to a semiautomatic handgun

---

[10] One pre-*Bruen* analysis offered a test for "Arms" consistent with the elements *Heller* pointed to: common use, unusualness, dangerousness, and use by law-abiding citizens for lawful purposes. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1481–82 (2009). Volokh suggested that "Arms" with the same level of practical dangerousness as those in common use are protected. *Id*. Machineguns fail this test due to their rapid rate of fire and the difficulty of firing them in a discriminating way. The same with short-barreled shotguns, which combine the lethality of a shotgun at the short distance characteristic of a criminal attack, and the concealability of a handgun. *Id*. at 1482.

The weapons banned by the Act and the ordinances here have the same practical dangerousness as those in common use among law-abiding citizens. *See id.* at 1485.

(protected in *Bruen* and *Heller*) than an automatic rifle such as the M16.[11]

Though dangerousness can be measured by many metrics, it is best to focus on what we know. The traditional demarcation for regulation has been between automatic and semiautomatic weapons. Fully automatic weapons have long been heavily regulated, and lawfully owned, fully automatic firearms are very rare and expensive.[12] The Act and ordinances violate that tradition.

The banned arms are "in common use." They are commonly possessed by law-abiding citizens for lawful purposes, including self-defense. They may be "dangerous"—as are all firearms—but they are not "unusual," and thus would not be within the history and tradition recognized in *Heller* of prohibiting "dangerous and unusual" weapons.

The Act and ordinances burden the rights of hundreds of thousands of law-abiding citizens to keep and bear the types of weapons and magazines that have long been deemed appropriate for self-defense. This leaves one option for the government parties—they must identify analogous weapons regulations from at or near the time of the Founding. These are the "how" and "why" questions of *Bruen*'s history and tradition test—"how" did the regulation burden the Second

---

[11] *See* STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15, at 9 (2022) ("The features that make an otherwise legal semiautomatic firearm an 'assault weapon' under various laws do nothing to affect the firearm's functional operation and, if anything, promote safe and accurate use.").

[12] *See* GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 108–10 (1997).

Amendment right, and "why" was this regulation adopted? The government parties offer a variety of historical regulations on weapons. These regulations show, they argue, that the Act and ordinances are consistent with the Nation's history and tradition. But the governments' examples are not relevantly similar—their "how" and "why" set them apart from the Act and ordinances here.

The government parties first point to regulations limiting the public carry of certain weapons, such as pistols, dirks (a long-bladed dagger), Bowie knives, and clubs. *See, e.g.,* 1813 Ky. Acts 100 (restricting concealed carry of weapons like pocket pistols, dirks, or swords in a cane, unless the individual was "travelling on a journey"); 1813 La. Acts. 172; 1819 Ind. Acts 39. But those regulations are limited only to the public carry of certain weapons. The Act and ordinances here do more, prohibiting the sale and eventually the possession of the banned firearms. The "how" of the current regulations is more burdensome than historical regulations limiting public carry of weapons.

The Bowie knife example offered by the government parties and relied on by the district court in *Bevis* falls short as a historical analogue under the "how" and "why" questions. The Bowie knife was not categorically banned, just burdened in certain ways. The "how" is different, as it was taxed, or it could not be carried. The "why" for the Bowie knife was also different. The knife was regulated because it was used in duels, not to stop a mass casualty event—the "why" proffered here.[13] Laws banning Bowie knives are also a poor analogue

---

[13] For example, the Naperville ordinance states its bans are a direct response to mass shootings over the last decade. *See* NAPERVILLE, ILL.

because of what they ban. Guns and knives present different dangers. Bodily harm is inflicted up-close and personal with a knife, and from a distance with a gun. These differences caution that the "how" and "why" behind historical Bowie knife regulations are not so comparable to justify the bans here.

Elsewhere, the government parties note historical bans on the sale, possession, and carry of pocket pistols, revolvers, and other kinds of weapons. Such regulations appear to have been uncommon. One example is an 1837 Georgia statute stating, "it shall not be lawful for any merchant … or any person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of weapon, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears … save such pistols as are known and used as horseman's pistols … ." 1837 Ga. Acts 90, § 1; *see also* 1879 Tenn. Pub. Acts 135–36, An Act to Prevent the Sale of Pistols, chap. 96 § 1; 1881 Ark. Acts 192, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI, § 3.

These regulations also tended to restrict only unusual kinds of pistols, preserving the right to continue carrying army or navy pistols. Even more, *Heller*, *McDonald*, and *Bruen* have solidified the constitutional right to own and carry handguns, so it is unclear what insights to draw from these defunct regulations. The "how" of regulations like the Georgia statute are thus distinguishable. The current regulations do far more than limit small, uncommon handguns or other

MUN. CODE tit. 3, ch.19 (reciting list of mass shootings and incorporating them into text of the ordinance).

outlier weapons. They limit access to many of the most popular models of semiautomatic rifles, handguns, shotguns, and magazines. The Act and ordinances therefore impose a far greater burden on the right to keep and bear arms. If all that is not enough, the Supreme Court of Georgia declared the 1837 statute unconstitutional to the extent it limited one's constitutional right to carry arms openly. *See Nunn v. State*, 1 Ga. 243, 251 (1846); *Bruen*, 142 S. Ct. at 2147 (discussing *Nunn* and the 1837 Act).

Cook County contends that historical regulations on gunpowder support their current ordinance. The County argues that the "why" of those regulations is comparable to the "why" of the Act and the county's ordinance—preventing mass casualty events. But the County's argument "flies too high." The "why" of the gunpowder regulations was to stop fires resulting from the combustion of stored flammable materials. Moreover, while gunpowder storage was regulated, purchasing and possessing gunpowder was not prohibited. Fire-safety laws do not create a comparable burden to an absolute ban on arms. *See Heller*, 554 U.S. at 632 ("Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as an absolute ban on handguns."). Even more, the Court rejected this gunpowder analogy in *Heller*. *Id.* ("Justice Breyer cites ... gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.").

Various government parties also offer as historical analogues regulations on trap or spring guns, fully automatic machineguns, and short-barreled rifles and shotguns. *See, e.g.*, 18 U.S.C. § 922(a)(4) (short-barreled shotguns and rifles); *id.* § 922(o) (machineguns); 1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 (trap guns). But the "how" and "why" of those restrictions are materially different as well. Trap or spring guns—rigged to fire when a string or other device is triggered by contact—do not provide a historical analogue. They fire indiscriminately, and the "why" of banning them—the imbalance of using lethal force to protect property versus human life—is different than the "why" the Act and ordinances seek to address of stopping escalating gun violence. Just so, machineguns can expend hundreds more rounds per second than even the fastest semiautomatic firearm, disqualifying such a law as an analogue.

The majority opinion also relies on anti-carry laws as analogues. But the challenged Act and ordinances ban possession of arms. The distinction between anti-carry and anti-possession laws is critical: the first limits only the way a person may use a firearm in public; the second categorically denies possession of a firearm for any purpose. To elide this difference between anti-carry and anti-possession laws ignores *Heller* and *Bruen*. *Bruen* states that the "central" consideration in assessing historical analogues is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133.

This leaves only those regulations restricting semiautomatic firearms and ammunition feeding devices, but those

regulations all come from the twentieth century. Even if valid for other reasons, *Bruen* states that regulations so far from the time of the Founding cannot meaningfully inform the history and tradition analysis. 142 S. Ct. at 2136–37 ("[W]e must also guard against giving postenactment history more weight than it can rightly bear.").

Even if the government parties had identified a historical analogue that satisfied the "how" and "why" inquiries of *Bruen*'s history and tradition test, a single such regulation was not enough in that case. 142 S. Ct. at 2153. In fact, three analogues were not enough in *Bruen*. *Id.* One can ask if there is any "why" in support of the Act and ordinances that did not also apply to the ownership and public carry of handguns in *Bruen.* If the "how" and "why" of handguns did not satisfy *Bruen*, what about these regulations supply a different "why"? This question was not adequately answered at oral argument.[14]

Because the Act and ordinances fail the "how" and "why" questions of *Bruen*, the government parties have not met their burden that these regulations are "relevantly similar" to a historical law. Some hypothetical laws might satisfy the history and tradition test—say, a law that banned carbine rifles that hold more than six rounds, or possession of a pistol that need not be reloaded. Magazines fall within the category of "Arms," so banning them must also satisfy the history and tradition test. For example, if there had been a historical analogue of "25 or fewer bullets is the number of shots a gun shall fire," the government parties might rely on that. But no such laws have been cited for firearms or magazines. The

---

[14] Oral Arg. at 15:20.

government parties have failed to show that the Act and ordinances are consistent with the Nation's history and tradition of firearm regulation. History and tradition do not support banning firearms and magazines so many citizens own, possess, and use for lawful purposes.

To finish up likelihood of success on the merits, I agree with my colleagues that on this record, the registration requirement does not appear to be unconstitutional.

## B

On the second consideration for a preliminary injunction, an alleged constitutional violation often constitutes irreparable harm. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022) ("When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary."). For some constitutional violations, particularly First Amendment violations, irreparable harm is presumed. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). Although the Supreme Court has not recognized a presumption of irreparable harm for Second Amendment violations, it has emphasized that the constitutional right to bear arms for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (citing *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).

This court has held that when a law is facially challenged under the Second Amendment, "the form of the claim and the substance of the Second Amendment right" create a "harm [that] is properly regarded as irreparable and having no

adequate remedy at law." *Ezell*, 651 F.3d at 699–700. In *Ezell*, the court likened the plaintiff's alleged Second Amendment harm to a First Amendment challenge, implying a presumption of irreparable harm. *Id.* In accord, the Ninth Circuit has held that there is a presumption of irreparable harm where a Second Amendment right is violated. *See Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023) ("[W]e presume that a constitutional violation causes a preliminary injunction movant irreparable harm and that preventing a constitutional violation is in the public interest.") Pre-*Bruen*, the D.C. Circuit concluded the same. *See Wrenn v. District of Columbia*, 864 F.3d 650, 667–68 (D.C. Cir. 2017).

Accordingly, a violation of the Second Amendment right presumptively causes irreparable harm. The Act and other ordinances challenged here violate the Second Amendment, and thus, irreparable harm has occurred. The majority opinion does not speak to irreparable harm.

Neither of the final two preliminary injunction factors—balance of the equities and what the public interest dictates—cuts against the plaintiffs. Gunshot victims and gun owners each claim harms, and what is in the public interest on questions of gun possession and ownership is constantly under public debate. So, I would rule that preliminary injunctions are justified against enforcement of the challenged laws.

## IV

In reaching the opposite result, the majority opinion applies precedent and reasoning that *Bruen* abrogated.

## A

Notwithstanding *Bruen*, the majority opinion relies on reasoning from this court's decision in *Friedman v. City of*

*Highland Park*, 784 F.3d 406 (7th Cir. 2015). *See also Wilson v. Cook County*, 937 F.3d 1028, 1035 (7th Cir. 2019) (relying on *Friedman* to dismiss a Second Amendment challenge to the Cook County ordinance banning assault weapons and large-capacity magazines). It is true that the Act regulates firearms and magazines in substantially the same way as the ordinances in *Friedman* (Highland Park) and in *Wilson* (Cook County), which were upheld. *Compare* 720 ILL. COMP. STAT. §§ 5/24-1.9(a)(1), 1.10(a) *with Friedman*, 784 F.3d at 407 *and Wilson*, 937 F.3d at 1029–30. As noted in I., the City of Chicago and City of Naperville ordinances are functionally similar to the Act and the Cook County ordinance.

In *Friedman*, this court announced a unique test for Second Amendment questions: "whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' … and whether law-abiding citizens retain adequate means of self-defense." 784 F.3d at 410. The government parties assert *Friedman* focused on the considerations identified by *Heller* and *Bruen*, specifically, historical evidence and the impact of the regulation on an individual's meaningful opportunities for self-defense. *Id.*; *Wilson*, 937 F.3d at 1033. *Friedman* is therefore compatible with the constitutional analysis endorsed by *Bruen*, the government parties submit, and *Friedman* remains good law and should control the outcome here.

But after *Bruen*, *Friedman's* test is no longer viable, and much of *Friedman* is inconsistent with it. The Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (cleaned up). That amendment's operative clause "does not

depend on service in the militia." *Id.* at 2127. Indeed, the dissent in *Bruen* admitted that under the majority opinion's holding the scope of the right to bear arms has "nothing whatever to do with service in a militia." *Id.* at 2177–78 (Breyer, J. dissenting). And "the right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano*, 577 U.S. at 421 (quoting *Heller*, 554 U.S. at 629).

This court in *Friedman* based its decision in substantial part on its view of the benefits of the ordinance, including that the arms ban reduced "perceived risk" and "makes the public feel safer." 784 F.3d at 411–12. But *Bruen* emphatically rejected this sort of interest-balancing. 142 S. Ct. at 2127. *Friedman* also held that categorical bans may be proper even if the limits do not "mirror restrictions that were on the books in 1791." 784 F.3d 410. The *Bruen* decision superseded that, concluding that a restriction on Second Amendment rights will survive scrutiny only if "the government identif[ies] a well-established and representative historical analogue" to the regulation. 142 S. Ct. 2133.

*Friedman* looked to history when it held that a court must ask whether the arms were common at the time of ratification. 784 F.3d at 410. But in *Bruen*, the Court was clear that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding.'" 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582); *see Caetano*, 577 U.S. at 411–12 (holding lower court's decision that arms were unprotected because they were not in common use at the time of ratification was "inconsistent with *Heller*").

In *Wilson*, this court described *Friedman* as "evaluat[ing] the importance of the reasons for the [ban] to determine

whether they justified the ban's intrusion on Second Amendment rights," such as the "'substantial' interest[]" in "making the public feel safer" and "overall dangerousness." *Wilson*, 937 F.3d at 1036. But *Bruen* rejected that interest-balancing approach as "inconsistent with *Heller*'s historical approach." *Bruen*, 142 S. Ct. at 2129. Governments may no longer "simply posit that the regulation promotes an important interest," *id.* at 2126, or advances a "substantial benefit," *Friedman*, 784 F.3d at 412. *Wilson* described *Friedman*'s application of an interest-balancing test as "intermediate scrutiny," *Wilson*, 937 F.3d at 1036, the approach *Bruen* expressly left behind.

Recently, in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), this court considered the new world *Bruen* presented for Second Amendment jurisprudence, in the context of possession of a firearm as a felon. *Id.* at 1022. There, we declined to avoid a *Bruen* analysis by relying on *Heller* and instead stated, "[w]e must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length." *Id.* Neither the majority nor the dissent in *Atkinson* discussed or even cited *Friedman*, although those opinions relied on other pre-*Bruen* precedents from our court.

In sum, *Bruen* effectively abrogated *Friedman* and *Wilson*. The "history and tradition" methodology of *Bruen* is not the framework applied in either of those cases. "Stare decisis cannot justify adherence to an approach that Supreme Court precedent forecloses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019). "When an intervening Supreme Court decision unsettles [this court's] precedent, it is the ruling of the [Supreme] Court … that must carry the day." *United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017). That happened here, and the district court in *Bevis* correctly

concluded that *Friedman* cannot be reconciled with *Bruen*. This court should review the challenged laws under *Bruen*'s framework, distinct from any interest-balancing approach, and separate from the reasoning employed in *Friedman* and *Wilson*.

The majority opinion is correct that *Friedman*'s test differs from the two-step interest balancing test of other courts that *Bruen* replaced. Nevertheless, *Friedman* cites to history to compare the arms the regulation bans, rather than the regulations themselves. 784 F.3d at 410. *Friedman* discusses the features of the weapons, including whether they are in common use for militia or police functions. *Id*. It also examines the gun's characteristics—such as its weight, caliber, and magazine capacity—as determinative of its value to self-defense. *Id*. at 411. Representative of that analysis, the majority opinion engages in a matching exercise between the AR-15 and the M16, assessing the similarity and differences of the characteristics of the two firearms.

In stark contrast, in *Bruen* the Court did not say "Arms" are defined by using the history and tradition of military versus civilian weaponry, such as the line drawn in the majority opinion. Rather, the Court looked to common usage to define the term "Arms." Even more, the assessment in *Bruen* is whether a firearm *regulation* has a historical analogue, 142 S. Ct. at 2133, not whether a *weapon* does. Under *Bruen*'s framework, courts can entertain the parties' arguments as to whether a regulation is a historical analogue. Per *Bruen*, whether firearm regulations were historically grounded in a military versus civilian distinction is to be performed as part of the history and tradition analysis, not in the plain text review, as the majority opinion does.

**B**

The majority opinion's reasoning departs from *Bruen* in other ways, which I examine next.

*1. A weapon's military counterpart does not determine whether it is an "Arm."*

The AR-15 is a civilian, not military, weapon. No army in the world uses a service rifle that is only semiautomatic.[15] Even so, the majority opinion uses a civilian firearm's military counterpart to determine whether it is an "Arm." But neither *Heller* nor *Bruen* draw a military/civilian line for the Second Amendment. Similarity between the AR-15 and the M16 should not be the basis on which to conclude that the AR-15 is not a weapon used in self-defense.

The majority opinion concludes that *Heller* limits the scope of "Arms" in the amendment to those not "dedicated to military use" and those possessed for a lawful purpose. Citing to "historical support" that "the Arms protected by the Second Amendment do not include weapons for the military," the majority opinion focuses on *Heller*'s comment about the M16 rifle. 554 U.S. at 627. The AR-15 and the M16 are similar weapons, my colleagues conclude, which means the AR-15 is beyond protection under the Second Amendment.

My colleagues read the passages in *Heller* discussing weapons with military capabilities too broadly, however, placing controlling weight on supporting or explanatory language in that decision. For example, *Heller* did not limit the scope of "Arms" to those without an analogous military

---

[15] E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193, 205–06 (2018).

capacity. 554 U.S. at 581–82. The majority opinion emphasizes the statement in *Heller* that "Arms" are "weapons that were not specifically designed for military use and were not employed in a military capacity." Maj. Op. at 26 (emphasis omitted). But this passage most naturally means that the public understanding of "Arms" encompassed more than weapons designed for or employed in a military capacity. At that section of *Heller*, the Court was refuting the argument that the Second Amendment only protected a military right to keep and bear arms. Instead, "Arms" was broad enough to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to coast at or strike another." *Heller*, 554 U.S. at 581. That passage in *Heller* does not support a reading that weapons the military uses are not "Arms."

Relying on *Heller*'s discussion of *United States v. Miller*— the Supreme Court's 1939 decision upholding a conviction under the National Firearms Act against a Second Amendment challenge—the majority opinion points out that militaristic weapons are not "bearable" and thus not "arms" at all. Justice Stevens in dissent in *Heller* viewed *Miller* as endorsing a military-only view of the Second Amendment. To him, *Miller* says regulating "the nonmilitary use and ownership of weapons" is fine—so the Amendment protects only the "right to keep and bear arms for certain military purposes." *Id.* at 637–38 (Stevens, J., dissenting).

But according to *Heller*, *Miller* does not say that the Second Amendment protects machineguns as part of ordinary military equipment. Rather, *Miller* explains that a short-barreled shotgun, the weapon at issue, is not "'any part of the ordinary military equipment'" nor "'could contribute to the common defense.'" *Id.* at 622 (quoting *Miller*, 307 U.S. at 178). In *Heller*,

the Court explained, "we therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625.

The majority opinion here quotes this passage and reframes it as a military-analogue test. It introduces the passage with *Heller*'s observation that an M16 is "most useful in military service." *Id.* at 627. But after *Heller*, we know *Miller* does not address a weapon's military use. Because the National Firearms Act of 1934 targeted the firearms most commonly used by criminals and gangs, Miller's "lawful use" language relates to criminal use, not military use.

One example of this military-analogue test falling short is when the majority opinion compares the rates of fire of the AR-15 and the M16. My colleagues credit the AR-15's rate of fire as "'only' 300 rounds per minute," which they do not see as a relevant difference from the M16's 700 rounds per minute. Maj. Op. at 33. The two record sources they point to do not support a 300-rounds-per-minute rate; in fact, those sources give good reasons to doubt that figure.

The first is the district court's opinion in *Bevis*, which explains: "[A] shooter using a semiautomatic weapon can launch thirty rounds in as little as six seconds, with an effective rate of about a bullet per second for each minute of firing, meeting the U.S. Army definition for 'rapid fire.'" Set to the side the district court's concession that the effective rate is actually only sixty rounds per minute. For the 300-rounds-per-minute figure, the district court cited a law journal article that spends nine pages discussing the dubious origins of the 300-

rounds-per-minute claim.[16] Wallace agrees that 30 shots in six seconds is possible—if you are an expert at operating firearms and you neglect aiming and reloading.[17]

The second source that might be referenced for the figure is a government witness's report in *Herrera*. James Yurgealitis included a chart listing weapons, an ammunition type, and the "semiautomatic cyclic rate" of each. Each rifle, including "M-16/AR-15 Rifle," has a cyclic rate of exactly 300 rounds per minute, and the three pistols have a rate of "300–400 rounds per minute." Yurgealitis offers no source for his calculations. He does not describe the firing conditions or how the shooter timed the shots.

Yurgealitis describes the rate as "cyclic," a type of fire where "the gunner holds the trigger to the rear while the assistant gunner feeds ammunition into the weapon." DEP'T OF THE ARMY, ARMY TRAINING PUBLICATION: INFANTRY PLATOON AND SQUAD, ATP 3-21.8, at Appendix F. The cyclic rate "produces the highest volume of fire the machine gun can fire" and is a drastic step, as it "can permanently damage the machine gun and barrel and should be used only in case of emergency." *Id.* It is difficult to see how a gunner could fire an AR-15 cyclically. Because it is a semiautomatic firearm, if the trigger were held to the rear, the cyclic rate would be one round per minute. Yurgealitis does not explain how this can be done.

The effective rate of fire, rather than the cyclic rate, would be a better comparison. There, Yurgealitis helps. He includes in his report a table from an Army field manual on rifle

---

[16] *See* Wallace, *supra* note 15 at 214–22.

[17] *See id.* at 217–18.

marksmanship listing the M16's maximum semiautomatic effective rate at 45 rounds per minute—more than four times slower than its maximum automatic effective rate.

*Heller* does not draw a line between firearms that are military counterparts and those that are not. That demarcation should not decide whether firearms and magazines are protected under the Second Amendment.

### 2. A "military weapon" is defined too broadly.

Even if *Heller* drew such a line, the majority opinion's standard for what constitutes a "military weapon" renders the "military" category substantially overbroad.

The majority opinion draws a line between "private" or "mixed private/military" weapons on one side (also characterized as "dual use" weapons) and "military weapons" on the other side. Military weapons are defined as "weapons that may be essentially reserved to the military," Maj. Op. at 31 n.8—meaning that a military weapon is one not made available for public use. The only "characteristic" that matters is that the government decided to ban it. "Dual use" weapons are those "private parties have a constitutionally protected right to 'keep and bear'" and "the military provides [] to its forces." *Id.* "In this sense, there is a thumb on the scale in favor of Second Amendment protection." *Id.* Under the majority opinion's definition, "dual use" weapons are on the side of the line protected by the Second Amendment.

Applying their framework, my colleagues find the AR-15 "more like" the M16 by comparing the firearms' characteristics. *Id*. To my colleagues, the firearms look the same ("same core design"), operate the same ("same patented operating system"), and have similar specifications (same ammunition,

kinetic energy, muzzle velocity, and effective range), identifying "the only meaningful distinction" as an M16's automatic-fire capability. *Id.* at 31–32. But because the AR-15 is not "essentially reserved to the military" and shares characteristics with "private" weapons, such as being semiautomatic, the AR-15 is at most a "dual use" weapon. So under the majority opinion's categories, the AR-15 should warrant Second Amendment protection.

In any event, because the majority opinion defines a military weapon as any that "may be essentially reserved to the military," a weapon's characteristics are not relevant to how it is categorized. Thus, any combat weapon would be a military weapon. This effectively allows the U.S. Armed Forces to decide what "Arms" are protected under the Second Amendment. Such a "military veto" is mistaken for at least three reasons.

First, the military has historically selected for commission firearms already publicly available and thus on the "dual use" side of the line. Privately available repeating and semiautomatic rifles, and the arms the American military selected for wartime use, overlapped substantially at least until the 1930's.

When the Second Amendment was ratified, repeaters—firearms capable of repeated firing before they required manual reloading—were useful for military purposes and were widely available for civilian purchase. The Girandoni air rifle, for example, was invented for the Austrian army.[18] The "state-of-the-art repeater" at the time, the Girandoni was

---

[18] Nicholas J. Johnson, et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 2206 (3d ed., 2021).

useful for hunting as well—Meriwether Lewis took one on his expedition.[19] In 1828, the military awarded a contract to a gunsmith to produce the Jennings repeater for military use.[20] But the military only "considered the guns promising" after seven years of "private use," as the repeater had been circulating at least since 1821.[21] Another repeater, the Henry, won a military contract after a Union captain used it to defend his home against seven Confederates who ambushed him while eating dinner with his family.[22]

In 1900, the military began considering semiautomatic rifles but, after years of searching, decided to stick with the .30'06 Springfield bolt-action rifle.[23] Even though "semi-automatic rifles for the civilian market were abundant," the military declined to select one because they were too complicated and brittle for field use.[24] In the 1930s, the military's desire to issue semiautomatic rifles caused it to "encourage[] … private experimentation" in development and testing.[25] A military veto contravenes the robust history of "dual use" weapons beyond the private sector.

---

[19] *See id.*

[20] *See id.* at 2221.

[21] *Id.*

[22] HORACE WILLIAM SHALER CLEVELAND, HINTS TO RIFLEMEN 180–81 (1864). *See also id.* at 179 (reproducing letter from a private citizen testifying to the exceptional quality of the weapon).

[23] *See* JOHNSON at 2233–34.

[24] *Id.* at 2233.

[25] *Id.* at 2234.

Second, the military has historically commissioned pistols, a firearm that is an "Arm" under *Heller*. Pistols have always been standard-issue military firearms. Under the majority opinion's approach, *Heller* would have been mistaken.

Major Pitcairn began the American Revolution with a shot from his pistol.[26] General George Washington carried pistols into battle at Valley Forge, Monmouth, and Yorktown.[27] In 1811, a brigade major in the Massachusetts militia described the pistol as a standard weapon for an infantryman in a comprehensive guide to the day's military science.[28]

The military has not stopped issuing pistols. In 1911, after lengthy trials and revisions with Colt and gun designer John Browning, the military selected for its troops the Colt Model 1911.[29] It is unclear whether that model was available for civilian purchase after the military contract in 1911. But like more common civilian handguns, the M1911 was semiautomatic and had an eight-round magazine.[30] Indeed, the Civilian Marksmanship Program, a federally chartered 501(c)(3)

---

[26] *See* CHARLES WINTHROP SAWYER, 1 FIREARMS IN AMERICAN HISTORY: 1600 TO 1800, at 72 (1910).

[27] *See* Evan Brune, *Arms of Independence: The Guns of the American Revolution*, AM. RIFLEMAN (July 2, 2021), https://www.americanrifleman.org/content/arms-of-independence-the-guns-of-the-american-revolution [https://perma.cc/9S69-T56Y].

[28] *See* E. HOYT, PRACTICAL INSTRUCTIONS FOR MILITARY OFFICERS 111 (1811).

[29] *See* JOHNSON at 2232.

[30] *See id.*

entity responsible for arranging sales of decommissioned military service weapons to the public, sells Colt M1911s today.[31]

In the 1980s, the military switched to the Beretta M9, a handgun with a counterpart available for purchase today on Beretta's website. In fact, the M9 was designed and available to civilians a decade before the military selected it as the Beretta 92.[32] The only differences between the military-issue M9 and the one for public sale are the markings, the dots on the sights, and the screw heads.[33] Under the majority opinion, the military's decision to award Beretta a military contract for the Beretta 92 would take the firearm out of the "Arms" protected by the Second Amendment.

Third, the military's decommissioning and sale of its surplus weapons would mean that the Second Amendment right might spring into and out of life. The military sometimes decommissions service weapons and sells them to the public through the Civilian Marksmanship Program, as mentioned

---

[31] *See About*, CIV. MARKSMANSHIP PROG. (2023), https://thecmp.org/about/ [https://perma.cc/L7T5-6T5D];*1911 Information*, CIV. MARKSMANSHIP PROG. (2023), https://thecmp.org/sales-and-service/1911-information/ [https://perma.cc/7HQW-G3VJ].

[32] *See American Service Pistols & Civilian Counterparts*, KEYSTONE SHOOTING CTR. (2023), https://keystoneshootingcenter.com/blog/american-service-pistols-civilian-counterparts [https://perma.cc/UG45-V46Q].

[33] *See* Christopher Bartocci, *Beretta Government vs Commercial M9 Identification*, SMALL ARMS SOLUTIONS LLC (May 28, 2018), https://smallarmssolutions.com/home/beretta-government-vs-commercial-m8-identification [https://perma.cc/EDT4-JEXT]; Bob Campbell, *Range Report: Beretta's M9 Civilian Version*, CHEAPER THAN DIRT: THE SHOOTER'S LOG (Feb. 22, 2016), https://blog.cheaperthandirt.com/berettas-m9-civilian-version [https://perma.cc/VL7T-ZXQA] ("The M9 is a variant that's as close to the military M9 as possible. The sights are marked in a different manner, and the finish differs from the standard M92.").

above. As with the M16, the military also decides not to renew contracts for weapons it deems no longer fit for military use. The majority opinion does not explain the status of a weapon like this, including whether the right to possess it springs to life, or if its analogues become "Arms."

   3.  *The examples given are not historical analogues.*

The majority opinion sets forth "the relevant question [a]s what are the modern analogues to the weapons people used for their personal self-defense in 1791, and perhaps as late as 1868." Maj. Op. at 38. But when declaring its holding in *Bruen*, the Court discussed historical analogues with reference not to weapons, but to regulations. Following *Heller*, *Bruen* considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. 2111, 2131–32. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126.

The seven historical examples the majority opinion offers as comparators are laws or ordinances which it says support "a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use." *Id.* at 45. For my colleagues, the challenged Act and ordinances carry forward this same distinction. Under *Bruen*, though, these examples do not satisfy the "how" and "why" questions in the history and tradition test, and thus are not comparators for the challenged Act or ordinances.

The first example is a 1746 Boston ordinance outlawing the discharge of a cannon, gun or pistol within city limits.[34] The second is an allusion to similar ordinances in Cleveland in the nineteenth century. The fourth refers to late nineteenth century ordinances restricting the carry of various weapons. except for peace officers. Such prohibitions differ, however, from a categorical ban of a class of weapons from private ownership which burden the right of armed self-defense. Regulations against the discharge of weapons compare better to modern criminal statutes prohibiting, for example, the reckless discharge of a firearm. *See* 720 ILL. COMP. STAT. § 5/24-1.5(a). And prohibitions on the carrying of certain weapons do not amount to a categorical ban of whole classes of firearms. These examples thus fail the "how" question in *Bruen*.

The fifth, sixth, and seventh examples are the National Firearms Act of 1934 and two amendments to it: the Omnibus Crime control and Safe Streets Act of 1968, and Firearm Owners' Protection Act of 1986. Yet these examples do not provide insight into the public understanding of the Second Amendment right in 1791 (or in 1868). They are too far removed from the ratification of the Constitution (or of the Fourteenth Amendment) to qualify as historical analogues under *Bruen*. They therefore fail the "why" question in *Bruen*.

The remaining third example cites dozens of Bowie knife regulations which forbid or limit their use, specifically citing an 1884 Arkansas statute outlawing "the sale of all dirks, Bowie knives, cane-swords, metal knuckles, and pistols, except as for use in the army or navy of the United States." This

---

[34] *Heller* rejected this regulation as a historical analogue. 554 U.S. at 633.

law was passed after ratification of the Fourteenth Amendment and banned the sale of these knives. It did not categorically ban their possession. This example fails the "how" and the "why" test of *Bruen* for the reasons given previously.

Attempting to show that the "how" test has been correctly applied, my colleagues point to what they consider a "huge carve-out" in the Act. Maj. Op. at 39. To the contrary, exceptions to the categorical ban in the Act are narrow. The Act outright forbids the manufacture, delivery, sale, importation, and purchasing of the covered arms within the state of Illinois. On January 1, 2024, a total ban on possession of the covered arms takes effect. 720 ILL. COMP. STAT. § 5/24-1.9(c). Though an exception exists for those who submit a compliant "endorsement affidavit" to the Illinois State Police, *id.* § 5/24-1.9(d), the majority opinion mistakes its scope. The exception is limited to the sale or transfer of a covered arm: (1) to seven specially excepted classes of authorized persons; (2) to the United States; or (3) in another state or for export. *Id.* § 5/24-1.9(e). And the only people who can take advantage of this exception are current in-state residents who possess a covered arm prior to January 1, 2024, and future in-state residents who move into Illinois already in possession of a covered arm. *Id.*[35] Such a narrow exception cannot legitimize a broad categorical ban on the ownership, possession, purchase, and sale of a vast swath of arms.

For my colleagues, it is sufficient that the seven regulations deemed similar "are representative of [the] tradition" of

---

[35] The municipal ordinances are even more limiting, excepting from their reach only military and law enforcement personnel. NAPERVILLE, ILL., MUN. CODE tit. 3 ch. 19 § 2; CHI. MUN. CODE § 8-20-075(b); COOK COUNTY, ILL. CODE § 54-212(a)(1).

"regulating the especially dangerous weapons of the time." Yet, *Bruen* requires more. The particulars of the historical analogues are critical; they illustrate whether the Act and the municipal ordinances place comparable burdens on the Second Amendment right when considered against historical analogues. *Bruen* itself gave weight to the differences between the particulars of regulations. 142 S. Ct. at 2148–49 (rejecting nineteenth century surety statutes as sufficiently analogous to restrictions on public carry because these laws did not constitute a "ban[] on public carry," indicating their "burden" on public carry was "likely too insignificant."). The examples the majority opinion cites may illustrate weapons regulation generally. But none of them is a categorical ban on an entire class of arms.

## V

Since *Bruen*, this is the first federal appellate court to uphold a categorical ban on semiautomatic weapons and certain magazines.

The decision in *Barnett* was correct. The district court properly rejected the notion that the Second Amendment protects only the possession and use of weapons for self-defense. The banned magazines are "Arms," as are other appurtenances such as a pistol grip and a flash suppressor. The court correctly read *Heller* and *Bruen* to locate "in common use" in *Bruen*'s history and tradition and applied the "how" and "why" test to conclude that concealed carry regulation differs from a ban on possession and does not pass as a historical analog. This led the court to correctly issue an injunction against the Act.

The district court in *Bevis* correctly found standing, noted that unlike other constitutional amendments the Second

Amendment protects a tangible item, and concluded that *Friedman* did not survive *Bruen*. I disagree, however, with the court's decisions in *Bevis* to limit "Arms" to those weapons that are not "particularly dangerous," and its justification of the Act and the Naperville ordinance under the historical test without mentioning *Bruen*'s "how" and "why" test. As noted above, the court's Bowie knife analogue misses the mark. In *Herrera* the district court relied heavily on the memorandum opinion and order in *Bevis*, incorporating large parts of that decision.

I would affirm the decision in *Barnett* and reverse the decisions in *Bevis* and *Herrera* and lift our court's stay on the injunction against the Act. I would vacate the decisions in *Bevis* and *Herrera* and remand for the district court to reconsider the denial of the injunction against the challenged municipal ordinances.

For these reasons, I respectfully dissent.